712 A.2d 41

**Ilene H. RICHMAN, et vir.,**

v.

**FWB BANK, et al.**

**No. 988, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

June 25, 1998.

112

Mark L. Shaffer (Baise & Miller, P.C., on the brief), Washington, DC, for appellants.

Thomas D. Murphy (James A. Mood, Jr., on the brief), Rockville, for appellees.

Argued before HOLLANDER and SALMON, JJ., and PAUL E. ALPERT, Judge (retired), Specially Assigned.

HOLLANDER, Judge.

The protracted history of this case stems from a 1989 loan agreement between Ilene and Edward Richman (the "Richmans"), appellants, and FWB Bank ("FWB" or the "Bank"), appellee.[1] The dispute spawned extensive litigation in federal and State courts. In particular, we focus on an opinion and order dated February 24, 1997, issued by the Circuit Court for

---

1. FWB was formerly known as the First Women's Bank of Maryland. In addition to FWB, several current or former officers, directors, or employees of FWB are also appellees here. They are: Joseph Betz, an FWB loan officer; Leonard Sloan, a former FWB director; Thomas Howlin, a senior credit officer and executive vice-president of FWB; Joan Schonholtz, FWB's Chairman of the Board; Nella C. Manes, a director and member of the executive loan committee of FWB; Miriam Cutler, a former FWB director; and Steven Colliatie, FWB's president and chief executive officer. The issues before us do not require discussion of the actions or duties of each appellee. Accordingly, we will generally refer to the appellees collectively, unless otherwise noted.

Montgomery County. Based on the doctrine of *res judicata*, the circuit court granted summary judgment in favor of appellees FWB, Joseph Betz, and Leonard Sloan, and granted a motion to dismiss filed by the other appellees. In analyzing whether the circuit court was legally correct, we must necessarily consider several opinions and orders issued by the United States Bankruptcy Court and the United States District Court, both for the District of Maryland.

Appellants present several questions for our review, which we have combined and reformulated:

I. Did the circuit court err in determining that appellants' State law claims were barred by the doctrine of *res judicata?*

II. Did the circuit court err in determining that the bankruptcy proceeding had a preclusive effect upon the circuit court proceeding when the complaint for turnover was not a "core" proceeding?

III. Did the circuit court err in concluding that appellants were in privity with the Chapter 7 bankruptcy trustee for purposes of analyzing the preclusive effect of the bankruptcy proceeding?

For the reasons set forth below, we answer Question I in the affirmative. Therefore, we need not address the remaining questions. Accordingly, we shall reverse the judgments and remand for further proceedings.

### FACTUAL SUMMARY [2]

On March 7, 1988, Ilene Richman contracted to purchase over nine acres of land in Haymarket, Virginia for commercial real estate development. She sought to procure financing for the project from FWB.[3] On September 22, 1989, the Rich-

---

**2.** In order fully to appreciate the issues in this case and the basis for our conclusions, we will present a rather detailed, chronological summary of the facts, many of which are undisputed.

**3.** According to an affidavit submitted by Ms. Richman in federal court, she purchased the property in Virginia in her own name and sought a

mans entered into a loan agreement (the "Loan Agreement") with FWB, by which the Bank agreed to lend appellants $500,000.00 (the "Loan") for an eighteen month term. The Loan was evidenced by a Deed of Trust Note (the "Note") dated September 22, 1989, and was secured by a Deed of Trust and Security Agreement of the same date. The Note was to mature on March 15, 1991, but it contained an extension clause that provided:

> (c) The Maturity Date may be extended for an additional six (6) month period provided Borrower is not in default hereunder and further provided Borrower notifies Noteholder in writing requesting such extension of the Maturity Date and pays Noteholder an extension fee equal to one percent (1%) of the sum of the outstanding principal balance at least thirty (30) days prior to the Maturity Date.

In the fall of 1990, Betz, a loan officer for FWB, allegedly informed Ms. Richman that FWB had determined not to extend the Loan Agreement, which appellants considered an anticipatory breach of contract. Nevertheless, appellants negotiated with FWB for an extension of the Loan Agreement and, in early 1991, Betz advised Ms. Richman that FWB would agree to extend the Loan, but only if the Richmans pledged additional collateral as security, reduced the size of the Loan, and established an interest reserve account. The collateral was to include the hypothecation of appellants' Shearson, Lehman Brothers, Inc. ("Shearson") stock account (the "Shearson Account"), the condominium of appellants' son, and appellants' interest in a limited partnership. Appellants agreed to the use of these assets as collateral for the extension of the Loan.

In accordance with the parties' agreement to extend the Loan, appellants executed a document entitled "MODIFICATION AND RESTATEMENT OF DEED OF TRUST

---

loan only in her name, for which she claimed she was "credit worthy." Nevertheless, she averred that FWB required her husband to co-sign for the Loan.

NOTE" (the "Modification Agreement") on or about May 1, 1991.[4] Pursuant to the Modification Agreement, appellant paid $25,000.00 toward the principal balance of the Loan, and the Loan was restated at $448,585.05. The terms included a maturity date of March 1, 1992 and an extension clause. At closing, appellants also executed the Hypothecation Agreement providing for a pledge of their Shearson Account in FWB's favor to the extent of $125,000. At the time, appellants' Shearson Account contained stocks, bonds, and a small amount of cash; the net value of the assets in the account apparently exceeded $180,000. Appellants also deposited $50,-000.00 in an interest reserve account, from which FWB was to withdraw monthly interest payments.

With regard to the Shearson Account, FWB prepared the Hypothecation Agreement, which stated, in part:

> In consideration of and to induce FWB Bank (the "Bank") to extend the Maturity Date of that certain loan in the amount of Four Hundred Forty–Eight Thousand Five Hundred Eighty–Five Dollars and Five Cents ($448,585.05) (the "Loan") to Edward Richman and Ilene H. Richman (hereinafter collectively called the "Borrower"), and to partially release that certain [D]eed of Trust and Security Agreement, dated September 22, 1989, as modified, securing the Loan, the Borrower hereby:
>
> 1. pledges with the Bank and grants the Bank a security interest in the property described in Exhibit A attached hereto . . . as security for the payment of all indebtedness . . . of the Borrower to the Bank. . . .

Exhibit A provided:

> All of the Borrower's right, title and interest in and to any amounts on deposit in the account held by the Borrower with Shearson Lehman Brothers, Inc. designated Account

---

4. The parties dispute the exact date of the execution of the Modification Agreement. It provided that it was "As of March 15, 1991." In a Memorandum Opinion and Order of August 2, 1994, however, the circuit court (Thompson, J.) concluded that the document was actually signed on May 1, 1991.

No. 6282588026038, together with all interest now or hereafter earned thereon and the proceeds thereof, to the extent of $125,000.00.

The Hypothecation Agreement also included a one page acknowledgment to be executed by Shearson. Although the Hypothecation Agreement was executed by appellants and the Bank promptly sent it to Shearson for signature, Shearson never executed the acknowledgment, because it had an internal policy not to hypothecate such accounts in favor of any bank.

One of the central disputes in this case concerns the parties' knowledge of Shearson's policy, with each side claiming ignorance for itself but insisting that the other side knew of the policy before commencing or consummating the negotiations to modify the Loan Agreement. Appellants allege that, prior to their execution of the Modification Agreement, FWB learned of Shearson's policy and deliberately concealed it from appellants. The Richmans maintain that appellees engineered appellants' default by fraudulently inducing them to agree to the modification on terms that appellees knew the Richmans could not satisfy. Conversely, appellees assert that the Richmans fraudulently induced FWB to extend the Loan and release its lien on a portion of the Virginia property, by agreeing to provide the Shearson Account as collateral, knowing that Shearson would not abide by the Hypothecation Agreement.

The interest reserve account, opened pursuant to the Modification Agreement, was quickly depleted. Further, when appellants failed to make payments of principal and interest due on the Loan balance for December 1991 and January 1992, FWB was unable to obtain the assets in the Shearson Account that were the subject of the Hypothecation Agreement. Consequently, in January 1992, the Bank called the Loan. The acceleration of the Note obligated appellants immediately to pay all principal, interest, and other fees due on the Note. Appellants contend that "[t]his scenario ultimate-

ly led to the bankruptcy of the Richmans," because it precipitated their "financial collapse."

On January 29, 1992, FWB instituted suit in the Circuit Court for Montgomery County ("Suit I") against the Richmans, alleging breach of contract, fraud, and default on the Note. FWB also filed an "Application for Writ of Attachment Before Judgment." On the same date, the circuit court issued a Writ of Garnishment Before Judgment against the Shearson Account (Hyatt, J.).

Thereafter, on February 27, 1992, the debtors moved to dissolve the garnishment. At a hearing on March 12, 1992, the circuit court (Cave, J.) indicated that it had "serious problems with the precise animal we have ridden in on the Court today." Nevertheless, the court determined not to dismiss the garnishment. Instead, it converted the garnishment to an *ex parte* injunction that appellants could then move to vacate.

Prior to filing their answer to Suit I, appellants filed a voluntary petition for bankruptcy on May 29, 1992, in the United States Bankruptcy Court for the District of Maryland, under Chapter 11 of the United States Bankruptcy Code. On that same date, appellants also filed a Suggestion of Bankruptcy in Suit I, which resulted in a stay of that case.

On September 3, 1992, FWB filed an adversary proceeding (the "Discharge Action") within the bankruptcy proceeding, by which it sought to preclude the discharge of appellants' debt, pursuant to 11 U.S.C. § 523(a)(2)(A).[5] The facts alleged by FWB in the Discharge Action were virtually identical to those alleged by it in Suit I. In sum, the Bank contended that appellants had fraudulently induced FWB to enter into the Modification Agreement, knowing that Shearson would not honor the Hypothecation Agreement.

---

5. In general, 11 U.S.C. § 523(a)(2)(A) provides that a debtor is not entitled to a discharge of any debt for money that was obtained by false pretenses, false representation, or fraud. Although we are unable to locate the Discharge Action in the Record Extract, it is undisputed that the matter was filed and that it is identical to the Bank claims in Suit I.

The bankruptcy court (Derby, J.) granted appellants' motion to lift the automatic stay with respect to Suit I on December 22, 1992, so that appellants could proceed in State court with their lender liability claims. Appellants immediately filed their answer to Suit I, along with a counterclaim against FWB and a third party complaint against Betz and Sloan [6] (hereinafter, we shall refer to these claims collectively as a "counterclaim"; any reference to Suit I will hereinafter also include the counterclaim). The Richmans alleged that FWB breached the original Loan Agreement by refusing to honor the contractual terms providing for an extension.[7] Moreover, they claimed that appellees fraudulently induced them to enter the Modification Agreement. In this regard, they asserted that appellees knew that Shearson would not agree to the Hypothecation Agreement, and failed to disclose this information to appellants.

Appellants also filed a five-count counterclaim in the Discharge Action (the "federal counterclaim"). The first four counts of the federal counterclaim were identical to the counterclaim lodged by appellants in Suit I.[8] Count I alleged

---

6. Specifically, appellants alleged anticipatory breach of contract (Count I); intentional misrepresentation (Count II); unfair and/or deceptive trade practices based on Maryland Code (1980, 1992 Repl.Vol.), § 5–807 of the Financial Institutions Article (Count III); and intentional interference with future business and economic relations (Count IV). The motions to dismiss filed by FWB, Betz, and Sloan were denied by the circuit court.

7. In the circuit court opinion of February 24, 1997, the court determined that the extension of the original maturity date in the Loan Agreement constituted a modification that "supersedes the terms of the original agreement." Accordingly, the court concluded that appellants had no cause of action as to the original Loan Agreement, and that their claim for breach of the Loan Agreement was "not actionable as a matter of law." The Richmans have not challenged that holding on appeal.

8. We are unable to locate the federal counterclaim in the Record Extract, nor can we ascertain the precise date on which it was filed. At a hearing in bankruptcy court, Judge Derby indicated that the first four counts of the federal counterclaim were identical to the counterclaim filed by appellants in Suit I. Moreover, at a hearing before Judge

breach of contract with respect to the Loan Agreement. Appellants asserted a claim for fraud in Count II. Count III alleged a violation of Maryland Code, Financial Institutions Article. In Count IV, appellants asserted a claim for tortious interference with economic relations. Count V was based on federal law, and alleged a claim of discrimination in violation of a Equal Credit Opportunity Act, 15 U.S.C. § 1691(c).

On March 4, 1993, the bankruptcy court (Derby, J.) held a hearing on four pending motions, including the Richmans' motion for summary judgment as to the Discharge Action and FWB's motion to dismiss the federal counterclaim. When the court reconvened on April 22, 1993, to deliver an oral opinion, it granted summary judgment in favor of appellants with respect to the Discharge Action, finding no basis for the fraud claim asserted by the Bank. With respect to Count V of the Richmans' federal counterclaim, the bankruptcy court ruled that it was untimely filed. Further, the court said:

> We are then left with an adversary proceeding that is no longer founded on federal law or on the Bankruptcy Code, but rather has four counts of a counter-complaint based on state law. This complaint is also pending in the state courts and this Court has previously granted a Motion for Lift Stay in order to allow the state court proceeding to proceed in the Circuit Court for Montgomery County.

* * *

The remaining counts relevant here to this adversary [proceeding] are the counter-claims for anticipatory breach of contract; fraudulent inducement; the Maryland Financial Institutions Article for prohibitive [sic] activities of anti-

---

Derby, counsel for appellants characterized Suit I as "a parallel, identical action" and represented that the federal "counter/claim is almost identical to the counterclaim filed in Montgomery County Circuit Court." Similarly, at a hearing on June 17, 1993, on the motion of appellees Betz and Sloan to dismiss the counterclaim in Suit I, appellees' counsel advised the court (McGuckian, J.), that the "same counterclaim" was filed in bankruptcy court.

competative, unfair and deceptive practices; and Count 4, for intentional interference with business relations.

\* \* \*

*We're dealing with state law cause[s] of action. We're dealing with theories under state law which the state court is both more familiar with and better able to deal with. There is a pending action and this Court has granted relief from stay to allow that pending action to go forward. The rights of the parties can be fully litigated before the state court.*

*Consequently, with respect to these remaining four counts of the counter-claim—these four state law causes of action, this Court will abstain and not rule on those counts and will defer to the state court for resolution of those particular issues as well as any state law fraud issues.* Since what I have ruled upon is the fraud necessary to establish the cause of action under *Section 523(a)(2)(A)* of the United States Bankruptcy Code.

Having acted on the federal causes of action and having abstained with respect to the state law claims, *I will based on the abstention dismiss the counter-claims.* Thus concluding this case as far as the Bankruptcy Court is concerned.

(Emphasis added).

On the same day, April 22, 1993, Judge Derby signed three separate orders that are of particular importance. In one, the court granted appellants' motion for summary judgment as to FWB's Discharge Action, and dismissed the Discharge Action. In another, the bankruptcy court dismissed Count V of appellants' federal counterclaim, on the ground that it was barred by the statute of limitations. That order also expressly provided: "[The] court conclud[ed] ... that the court should abstain from the remaining State law counts...." Finally, Judge Derby entered an order *dismissing* the first four counts of appellants' federal counterclaim in the Discharge Action, without prejudice. The order said, in pertinent part:

[N]o counts [of the counterclaim] under federal law remaining, the only remaining matters being Counts I through IV of the counterclaim under State law, the stay having been lifted to allow State case to proceed, the [court] having concluded it should abstain in favor of the pending State court proceeding as to the State law counts.

\* \* \*

Ordered, That as to Counts I through IV of the counterclaim, this court abstains, and this adversary proceeding is hereby dismissed.

On April 23, 1993—just one day after the bankruptcy court delivered its oral opinion dismissing appellants' federal counterclaim—the Richmans filed an adversary action within the bankruptcy proceeding. Styled a Complaint for Turnover (the "Turnover Action"), appellants named both FWB and Shearson as defendants in an action. Alleging that the Shearson Account was property of the estate, they sought to have the proceeds of the Shearson Account turned over to the bankruptcy estate, to be used for payment of appellants' creditors. Appellants claimed that "FWB never had a perfected security interest in the Shearson account and the Shearson Lehman account is not FWB collateral." In addition, in paragraph 12, the Richmans specifically referred to the bankruptcy court's ruling of April 22, 1993, in which it determined that appellants had not committed fraud. By Consent Order, Shearson was dismissed as a party after remitting $113,409.23 to the registry of the bankruptcy court on August 20, 1993.

In its amended answer and counterclaim filed in the Turnover Action, FWB claimed that it had a perfected security interest in the proceeds of the Shearson Account as of May 15, 1991, when Shearson received the Hypothecation Agreement. Alternatively, the Bank claimed it had such an interest as of January 31, 1992, when Shearson was served with the Writ of Attachment issued by the circuit court.

The parties subsequently filed cross motions for summary judgment in the Turnover Action. As best we can determine from excerpts in the Record Extract, FWB opposed appel-

lants' motion on grounds that seemingly conflict with the position it asserts before us and that it advanced to the circuit court in regard to the motion for summary judgment now in issue. The Bank urged the court not to proceed until Suit I was resolved, stating:

> The Richmans sought and obtained relief from the automatic stay to pursue the Circuit Court of Montgomery County action giving rise to the attachment of the Shearson Account. *Until such time as there is a determination in the Circuit Court, any action with regard to the Shearson Account in this Court is premature.* The Richmans themselves sought to have this dispute adjudicated in the Circuit Court for Montgomery County and, therefore, have voluntarily subjected themselves to the jurisdiction of that court for the purposes of determining the relative claims associated with the Shearson Account. *Until there has been a final adjudication in the Circuit Court, no action can be taken with the Shearson Account.*

(Emphasis added).

Judge Derby agreed with FWB. He denied the motions in the Turnover Action in a Memorandum Opinion of February 23, 1994. There, Judge Derby reiterated that the bankruptcy court would *"abstain[ ] from hearing this matter until after the litigation between the parties now pending in the Circuit Court for Montgomery County, Maryland is concluded. . . ."* (Emphasis added).

Interestingly, the bankruptcy court revisited the history of the proceedings in its opinion. The court noted that it had granted relief from stay so that the Richmans could "file and prosecute to judgment [in State court] a multi-count counterclaim against FWB bank and a third party complaint." The court also explained that it had previously dismissed as unfounded FWB's complaint seeking to prevent appellants' discharge based on fraud. Additionally, the court recounted that, in the Discharge Action, it had dismissed the one count of the Richmans' federal counterclaim that was based on federal law, and then "abstained from the four remaining State law causes

of action alleged in Debtors' counterclaim in favor of the pending action in the Circuit Court for Montgomery County."

As to the particular motions that were then before him in the Turnover Action, Judge Derby said:

Debtors argue the court's prior ruling, namely, that granted Debtors summary judgment because FWB Bank had failed to show the present intent to defraud required to deny dischargeability under Section 523(a)(2)(A) of the federal Bankruptcy Code, constitutes law of the case that an attachment by the State court before judgment was not justified. This argument fails to acknowledge that the attachment before judgment was issued by the State Circuit Court for Montgomery County under State law, and that *this court has granted relief from the automatic stay in favor of the circuit court to determine the State causes of action between the parties. As a matter of comity, and because this court has elected to abstain in favor of a pending case in the state courts, this court should not, and will not, meddle in the state court process.*

* * *

FWB Bank argues in support of its cross motion for summary judgment that it has a perfected security interest dating from when levy was made on January 31, 1992 of the attachment on original process. The attachment, it emphasizes, was treated by the circuit court as a preliminary injunction. Debtors argue that at best the lien dates from entry of the injunction after the March 12, 1992 hearing, if indeed the injunction created a lien. Since March 12, 1992 was within 90 days before Debtors filed their bankruptcy case on May 29, 1992, it constitutes an avoidable preference.

These circuit court orders were only preliminary to protect the res. *This court has deferred to the circuit court to determine the State law claims.* Although the bankruptcy court presently has physical custody of the account to protect it pending resolution of the State law claims, the bankruptcy court should not modify what the State court has done or be asked to overrule a State court order under

State law. The fact is that the State court did not dissolve the garnishment, but rather treated it as an *ex parte* injunction on the same terms. If clarification is desired, it should be sought from the Circuit Court for Montgomery County. It has revisory powers over its own orders.

Further, since *the Bankruptcy Court has deferred to the State courts to determine liability,* it is premature to interpret the significance of the circuit court's preliminary orders since they will be moot if Debtors prevail, and they may be subject to revision by the circuit court before it renders a final decision. Further, it was Debtors that requested the bankruptcy court to abstain in favor of the circuit court to determine the nonbankruptcy causes of action. Therefore, it would be unseemly to allow Debtors to alter their chosen forum at this juncture to pursue some perceived benefit.

*The parties also disagree on the legal effect of the Hypothecation Agreement covering the Shearson Account. Again, that issue should await the circuit court's disposition of the case pending before it. When the State court has made its rulings on the claims of the parties against each other under State law, the bankruptcy court will then apply those rulings to complete the administration of this estate under bankruptcy law.*

(Emphasis added).

In a separate Order of February 23, 1994, Judge Derby stated, in part:

ORDERED, that this Court abstains from hearing this matter until after the litigation between the parties now pending in the Circuit Court for Montgomery County, Maryland is concluded; and it is further

ORDERED that this order is without prejudice to the reactivation of this adversary proceeding, including the filing of new motions for summary judgment, *after* the litigation between the parties now pending in the Circuit Court for Montgomery County, Maryland has concluded.

(Emphasis added).

Subsequently, on April 29, 1994, appellants moved for partial summary judgment as to FWB's fraud claim in Suit I, on

the ground that the bankruptcy court had determined that there was no evidence of fraud by appellants concerning the loan transaction. They also sought to dissolve the injunction of March 12, 1992, as to the Shearson Account. After a hearing in circuit court, Judge Thompson issued a well reasoned Memorandum Opinion and Order dated July 29, 1994. Based on collateral estoppel, he entered partial summary judgment in favor of the Richmans as to FWB's fraud claim based on the Hypothecation Agreement. The circuit court said, in part:

> The Court is satisfied that Judge Derby rendered a final decision on the fraud issue [in his April 22, 1993 ruling]. Judicial economy will best be served by preventing relitigation of an issue competently decided in a prior adjudication.

> \* \* \*

> Upon consideration of the Defendants' motion, the arguments of counsel, and Judge Derby's oral opinion, the Court finds that the elements of collateral estoppel are satisfied and that the issue of intent to deceive, which was not factually supported in the bankruptcy proceeding, will bar [FWB] from proceeding with its common law fraud claim in this Court.

The circuit court also granted appellants' motion to dissolve the garnishment, noting that FWB had failed to furnish the requisite affidavit or bond. Although the court indicated that it was not clear why the attachment before judgment had been converted to an *ex parte* injunction on March 12, 1992, it nonetheless was satisfied that it had expired. Therefore, it also granted appellants' motion to dissolve the injunction.

In the meantime, in May 1994, FWB filed another adversary proceeding in bankruptcy court, seeking to enjoin the debtors from proceeding with the State litigation pending confirmation of FWB's proposed plan of reorganization. Although an evidentiary hearing was held in bankruptcy court on June 7, 1994 before Judge Keir, the record extract does not reveal the court's disposition as to the motion.

A hearing was held in bankruptcy court on August 15, 1994, before Judge Duncan Keir, concerning confirmation of the plan for reorganization and the motion to convert the case to a Chapter 7 proceeding.[9] Applying collateral estoppel, Judge Keir rejected FWB's claim of a lien against the Shearson Account, because of the circuit court's disposition of the Bank's attachment before judgment. Nevertheless, he said:

However, the separately stated issue in the adversary proceeding just enumerated that [FWB] has a lien upon the fund based upon a perfected security interest was not determined and is not precluded by the ruling of the state court. The Court finds this because first of all it was not before the state court. It was not a necessary issue raised by either party to that court for the determination of the liability arising from the alleged fraud and disposed of now as an issue, and the liability asserted generally under the notes because that liability would not rise or fall on the determination of whether there was a security interest securing in part or in whole the notes, nor raised and needed to be raised by the debtor in alleging wrongful practices by the lender.

Therefore it is clear that the state court did not intend to rule on the issue and it may well be that the state court would have exceeded its jurisdiction had it done so.

The money is property of the estate to the extent of the interest of the debtor under § 541(a) of the Bankruptcy Code and absent an expressed order by this Court lifting the stay, this Court has primary jurisdiction over issues concerning estate property. *I read Judge Derby's order. What Judge Derby did in [the Turnover Action] in denying cross motions and then going further is abstain pending certain rulings by the state court. One of those rulings has occurred. There is no [attachment before judgment].*

The other ruling which could bear on this issue would be the ruling on the actual liability of the debtor to the lender.

---

**9.** The record extract does not contain the entire transcript of this hearing.

Obviously if the debtor doesn't owe the lender any money, then the lender doesn't have a security interest because there is nothing to secure. *But I do not read Judge Derby's order as referring to the state court the issue concerning the consensual lien rights of the parties, i.e., their, in effect, ownership rights to this fund. That has not been ruled on. There is no disposition of this issue.* Accordingly, the fund remains subject to the claims of [FWB] whether they are with or without merit.

(Emphasis added).

On August 15, 1994, appellants' bankruptcy case was converted to a Chapter 7 proceeding. As a result, Michael G. Wolff was appointed as the Chapter 7 trustee, thereby succeeding appellants as the plaintiff in the Turnover Action. Moreover, the estate succeeded to the debtors' claims against appellees. Appellants maintained, however, that their personal claims did not belong to the Bankruptcy estate.[10]

The law firm of Gordon & Simmons had been approved as "Special Counsel" to appellants when they filed their State claims against FWB. When the case was converted to a Chapter 7 proceeding, they continued as Special Counsel to the Trustee; in particular they were retained to represent the estate in the State litigation. Nevertheless, the record reveals a rather strained relationship between Wolff and Roger Simmons, Esquire.

In late 1994, for example, the trustee and appellants apparently agreed to a sale of assets by the trustee to the debtors, subject to bankruptcy court approval. In the Notice of Filing

---

10. The parties have not addressed, and we need not consider, appellants' rights to pursue their claims against appellees in light of the Chapter 7 proceedings. We observe, however, that at the summary judgment hearing before Judge Thompson, counsel for appellees said: "Today we stand here before you with the Richmans having purchased this claim. Remember that in August 1994 voluntarily converted [sic] from 11 to 7, the trustee stood in their shoes entirely and vice versa, and the trustee pursued the turnover litigation and then in November or October Judge Keir approved the sale of this claim to the Richmans, so whatever happened in terms of last year they stand in identical shoes with the trustee. There is no question about that."

Joint Motion To Authorize Sale of Assets by Trustee to Debtors, the trustee represented that the "estate is selling to the Debtors all assets EXCEPT litigation of FWB's claim against the estate, and the Debtors' counter-claim, pending in the Circuit Court for Montgomery County, Maryland. The Trustee believes that the Debtors' Counter-claim against FWB is the estate's most valuable asset." By letter of December 23, 1994, Wolff advised Simmons that the Richmans' counterclaims in Suit I were not assets to be included in the sale to the debtors. Wolff admonished Simmons, stating: "As Trustee of the estate, I expect you to continue as its counsel and that the counterclaims will be fully prosecuted in the Circuit Court for Montgomery County. I urge you to request that the Court set a trial date in the case for the earliest possible date." At that point, Suit I was scheduled for trial on June 19, 1995.

Skipping briefly ahead, when FWB and Wolff engaged in settlement negotiations, Simmons, on behalf of the Richmans, and as special counsel to the trustee, opposed the trustee's position. As part of the negotiations, Wolff and FWB filed a joint motion on March 3, 1995 to remove Suit I from the circuit court's trial calendar of June 19, 1995. The court granted the motion that day, apparently because, on its face, the motion appeared to have the consent of both sides. Thereafter, appellants, through Simmons, moved to reconsider and to vacate the order granting the postponement of trial. An obviously angry Simmons detailed numerous concerns about the conduct of the trustee and FWB's counsel. The Bank, Betz, and Sloan filed an equally vitriolic response, in which they asserted that they were "stunned at the chutzpah displayed by Roger Simmons." Wolff replied by letter. That did not end the matter, however; Simmons filed a reply to both. Nonetheless, the court denied appellants' motion.

Simmons also wrote to the U.S. Trustee on March 3, 1995, complaining about Wolff. In his letter, he disputed FWB's interest in properties it was to contribute to the settlement with the trustee, such as the funds from the Shearson Account. He also complained that Wolff sought the postpone-

ment of Suit I. Judge Keir later noted that, ultimately, Simmons could not represent the trustee due to a conflict of interest.

Returning to our chronological review, Judge Keir conducted a status conference concerning the Turnover Action on November 3, 1994.[11] After asking opposing counsel to correct him if he was wrong, Wolff informed Judge Keir that the State court had "resolved the issue that it had to resolve which is that there was not a perfected lien against the funds, the collateral. What is left is a bankruptcy issue as to whether there is a consensual lien and whether that lien is now avoidable by the trustee to get those funds." Judge Keir responded: "The issue of consensual lien is not before the state court action?" Wolff replied: "That's my understanding. It has only been raised in the bankruptcy court...." Wolff apparently was referring to the fact that the State court, by that point, had decided that FWB was not entitled to the prejudgment attachment on the Shearson Account. Indeed, Judge Keir had so noted in his oral ruling of August 15, 1994. In any event, Judge Derby had deferred to the State court *all* of the State claims set forth in appellants' federal counterclaim, and they clearly had not been resolved by November 3, 1994.

On January 27, 1995, appellants filed suit in the Circuit Court for Montgomery County ("Suit II") against Joan Schonholtz, Nella C. Manes, Miriam Cutler, Thomas Howlin, and Steven Colliatie. In Count I, they alleged fraud and sought recission of the "Extension Note." Count II claimed intentional interference with business and economic relations. By order of the same date, the circuit court consolidated Suit I and Suit II.

Judge Keir held a hearing on March 7, 1995, with regard to FWB's renewed motion for summary judgment in the Turnover Action and the Chapter 7 trustee's motion for summary

---

11. The record extract only contains a portion of the transcript in regard to the hearing of November 3, 1994.

judgment in that matter. The hearing concerned the Shearson Account, for which FWB alleged it held a perfected security interest; the trustee, as successor in interest to the debtor-in-possession, disputed FWB's position.[12] The court articulated its understanding of the issue before it, stating:

The question is at the time the hypothecation agreement was signed, and including its delivery to Shearson, was there (a) created, and (b) perfected, a security interest.

Although the court indicated that appellants no longer had standing because of the Chapter 7 status of the proceedings, he permitted their counsel to argue. The Richmans' attorney said:

First I'd like to make it clear that we're not conceding for purposes other than this hearing on summary judgment that there was a knowing grant of security interest. The fact of whether fraud existed in the creation of that loan and the documentation of that loan was referred by this court to the state court for a determination, so that for this proceeding we have agreed that—we have stipulated that the hypothecation agreement was signed and delivered to the bank, we are not for state court purposes for the circuit court case admitting that—let me say this correctly—we are reserving our rights to argue that fraud existed in obtaining this document and therefore the document may not be enforceable.

Judge Keir replied:

I hear you but I don't believe the allegation of fraud is before this Court in this adversary proceeding any longer. Now what the effect of that in the state court, I make no ruling upon. But if memory serves me correctly, and I know there has been more than one adversary proceeding here and more than one state court suit filed, but as I

---

12. The record extract does not contain the entire transcript of the hearing. Nor does the record extract contain the trustee's legal memorandum in support of his motion, in which he presumably offered reasons to support his assertion that the Bank did not have a perfected security interest in the Shearson Account.

recollect the one that pertained to this Shearson account balance issue, there was an adversary filed here, money paid into the registry of the court. Judge Derby stayed further proceedings in this adversary and permitted the matter to go forward in state court for determination of the [Attachment Before Judgment] injunctive relief that had been granted in the state court stating that that was a state court order the legitimacy or survival of which should be decided by the granting court.

That the state court then did and removed as a basis for the claim of lien by FWB the [Attachment Before Judgment] order. I believe that it did so finding that there wasn't the basis of fraud necessary to get an [Attachment Before Judgment] under state law. I'm not telling you what the—and I'm making no finding about what the length in state court of the preclusive doctrine might be. That's not before me.

There was then a hearing before this Court and this judge in which FWB, when this Court asked for a status conference because now the stay issued by Judge Derby on this adversary appeared to be satisfied in its predicate act, i.e., the state court had adjudicated that issue, FWB raised its alternative theory, if you wish to label it that, of a consensual lien—and it has been briefed before this Court by the parties—on the issue of whether the consensual lien granted prior to the [Attachment Before Judgment] action in the form of this hypothecation agreement is or is not a perfected lien which would survive the avoidance powers of the trustee under Section 544. That's where we are today.

Again, I don't believe that a ruling by this Court on that is (a) precluded by any further assertions of fraud which the parties may have in some state court proceeding because it has not been raised in this adversary; and secondly, I make no rulings as to what effect any ruling of this Court would have on the state court action as that would be determined by the court in the action in which preclusion would be asserted by some party, not the court whose action might be alleged to be the basis for such assertion.

I understand you but I don't think it's relevant to the issue before this Court today.

(Emphasis added).

By order dated April 21, 1995, Judge Keir granted summary judgment in favor of FWB in the Turnover Action. The bankruptcy court determined that FWB "holds a perfected security interest in the proceeds paid by Shearson Lehman Brothers, Inc., into the registry of the United States Bankruptcy Court."

In his accompanying Memorandum Opinion, Judge Keir explained that the parties asked the court "to summarily decide whether FWB has a perfected security interest in the debtors' account at Shearson...." After reviewing the procedural history of the litigation, he also noted that the "adversary proceeding was ... reactiviated to decide the remaining issue, *i.e.*, does FWB Bank have a perfected consensual lien upon the funds placed in the registry of this court by Shearson."

Citing 11 U.S.C. § 544(a)(1), Judge Keir acknowledged that in order for FWB to have priority over a judicial lien executed on the Shearson Account at the time of the filing of the bankruptcy case, FWB had to demonstrate that it had a perfected lien against the proceeds of the Shearson Account when the bankruptcy petition was filed. Otherwise, as the holder of an unperfected security interest, its rights would be subordinate to those of a judicial lien creditor, Maryland Code (1992 Vol.), Comm. Law Art., § 9–301(1)(b), and would not defeat the trustee's rights under 11 U.S.C. § 544(a)(1).

Judge Keir also recognized that the Hypothecation Agreement was intended to create a security interest. *See* Md. Code, Comm. Law § 9–102. Further, he found that the Hypothecation Agreement was "clearly sufficient" in its description to constitute a security agreement. Md.Code, Comm. Law, § 9–203. Moreover, the court rejected the Richmans' argument that the collateral amounted to "general intangibles," for which a financing statement was required but not filed, because Shearson held securities in an account for

the debtors. Based on Md.Code, Comm. Law, §§ 8–313, 8–321, 9–302(1)(f), and 9–304(1), Judge Keir concluded that when the Hypothecation Agreement was sent to Shearson, "notification caused a transfer of the security interest in the securities in the Shearson account to FWB and perfection of that security interest by such transfer." The court also determined that it was unnecessary for Shearson to execute the Hypothecation Agreement in order to create a perfected security interest.

Appellants and Gordon & Simmons as Special Counsel filed a motion for reconsideration of Judge Keir's April 25, 1995 order granting summary judgment to FWB. The Richmans asserted that Judge Keir's decision contravened Judge Derby's order of February 23, 1994, in which he abstained from resolving the cross motions for summary judgment in the Turnover Action, pending resolution of the State court issues. They also asserted that the bankruptcy court's ruling was premature, because neither the circuit court nor the bankruptcy court had determined whether the Hypothecation Agreement was enforceable, and the question of its enforceability was at issue in State court. Although appellants only briefly mentioned their federal counterclaim, in the context of "a different adversary proceeding," they omitted any specific reference to Judge Derby's orders of April 1993. Nevertheless, they pointed out that their fraud claims were pending in State court because of Judge Derby's rulings in both the Discharge Action and the Turnover Action. Therefore, they urged that "the [Bankruptcy] Court cannot grant FWB's Motion for Summary Judgment, which enforces the terms of the Hypothecation Agreement, before conducting an evidentiary hearing on the Richmans' claim of fraud in the inducement of the Hypothecation Agreement."

In denying the motion to reconsider on July 21, 1995, Judge Keir concluded that none of the movants had standing. Nonetheless, the court proceeded to discuss the substance of the motion. In so doing, Judge Keir emphatically rejected appellants' contentions, and sharply criticized their "gerrymandering strategy." In particular, the court ruled that appellants'

fraud claim had been asserted for the first time and was therefore too late. The court said:

> The simple fact is that the estate at no time raised an issue in this adversary proceeding for turnover, that the Hypothecation Agreement was not enforceable because of an allegation of fraudulent inducement. It cannot now be successfully raised for the first time in this suit on a motion for reconsideration.
>
> After a detailed review of the adversary file, with special attention given to the renewed motions for summary judgment, this court can find absolutely no reference by either party to the *enforceability* of the Hypothecation Agreement.

(Footnote omitted).

In his opinion, Judge Keir did not specifically address the April 1993 orders. Nevertheless, he rejected any suggestion that appellants relied on Judge Derby's order of February 23, 1994, as the basis for their failure to plead fraud in the Turnover Action. He said:

> Nowhere in the Order of February 23, 1994, is there any reference to such limitation of issues. That order abstains from hearing the adversary proceeding until after litigation between the parties pending in the Circuit Court for Montgomery County is concluded. It does not limit the scope of the adversary proceeding or any necessary legal issues to be brought in conjunction with the adversary proceeding.

Further, the court determined that the Richmans could not have relied on the February 1994 order, because it "was entered almost one (1) year *after* the commencement of this adversary proceeding, *i.e.,* the complaint, and the first Motions for Summary Judgment were filed before Judge Derby's abstention set forth in the Order entered February 23, 1994, denying Cross Motions for Summary Judgment."

Additionally, the bankruptcy court explained that, in August 1994, at the hearing on the confirmation of the plan of reorganization, appellants advised him that the circuit court had "resolved all outstanding issues in this Turnover Action," and urged use of the Shearson Account funds for their plan.

In response, the Bank noted that all issues had not been resolved. Then, "both parties agreed that the adversary proceeding should . . . go forward on [the issue of the consensual lien"]. The court maintained that when both parties agreed that no further State court action was needed in order to resolve the Turnover Action, it scheduled a status conference, which was held in November 1994. At that time, "the remaining issue of Article 8 perfection [was scheduled] for trial." The court added:

> To the extent that Judge Derby's February 23, 1994 Order contemplated that a greater determination of matters pending before the state court would occur before the turnover adversary proceeding was reactivated, the parties in August of 1994 (which then included the debtor-in-possession) and in November, 1994 (including the trustee as successor plaintiff), represented to this court that the stay/abstention of this court's determination of the turnover action should be lifted.

Therefore, Judge Keir specifically found that "neither party assert[ed] that any further State court action need be completed before this turnover suit should be determined. . . ."

With respect to appellants' failure to plead fraud in the Turnover Action, what the bankruptcy court said is especially noteworthy:

> [I]n the prosecution of the issue of whether or not FWB held a perfected security interest in the Shearson Account proceeds, *the estate could have asserted any defense to the alleged perfected security interest. The estate raised, briefed and argued only the defense of failure to obtain and perfect a security interest under the Uniform Commercial Code but did not assert any defense that the contract was obtained by fraud. The fact that such allegation may have existed in separate state court suits pending at the same time, did not present that issue before this court, nor was that issue brought before this court by Judge Derby's February 23, 1994 Order,* or precluded from being so brought as discussed above.

*The issue of fraudulent inducement was first alluded to in this adversary proceeding by counsel for the debtor who* was permitted the courtesy of argument *on the renewed Motions for Summary Judgment.*

\* \* \*

At no time did the then non-party debtor ... assert [at the hearing] invalidity of the Hypothecation Agreement as an issue before this court. Debtor simply attempted to limit the preclusive effect which this court's order might be given in another court and in another action. *Such attempted limitation of a legal doctrine of preclusion is not a substitute for raising in any fashion a potential issue concerning the determination which each party was seeking by this court.*

(Emphasis added) (footnote omitted).

Appellants appealed Judge Keir's denial of the motion to reconsider to the United States District Court for the District of Maryland, which affirmed. In its Memorandum Opinion dated November 30, 1995, that court (Williams, Jr., J.) concluded, without a hearing, that appellants lacked standing to seek post-judgment relief. The court also said:

In addition, the Debtors have presented no grounds for relief from the bankruptcy court's order. *They maintain that the bankruptcy court failed to consider that the Appellee held the funds pursuant to a fraudulently obtained lien. However, as the bankruptcy court noted, despite ample opportunity, the estate did not raise that argument.* Op. at 8–12. The bankruptcy court did not abuse its discretion in finding that the Debtors could not raise this argument in a post-judgment motion.

\* \* \*

Finally, the bankruptcy court did not abuse its discretion in ruling on the motions for summary judgment. Judge Stephen Derby had previously stayed resolution of the turnover action pending the action in the Circuit Court for Montgomery County, Maryland involving the Debtors' allegations of fraud. However, the parties later agreed that the

summary judgment motions should proceed despite the°
litigation in state court.

(Emphasis added).

Subsequently, appellants noted an appeal to the United
States Court of Appeals for the Fourth Circuit, challenging
the district court's denial of their motion to intervene as a
matter of right in order to appeal Judge Keir's decision.
*Richman v. First Woman's Bank,* 104 F.3d 654 (4th Cir.1997).
Noting that the case was "long" and "procedurally complex,"
*id.* at 655-56, the Fourth Circuit determined that appellants
did not satisfy the requirements for intervention of right,
because they failed to submit a timely motion to intervene in
the Turnover Action, and did not establish that the Chapter 7
trustee inadequately represented their interests. Therefore,
the court concluded that appellants were not parties to the
underlying adversary proceeding. Nevertheless, the court
observed that Judge Keir did not "expressly make any find-
ings regarding the fraudulent inducement issue," *id.* at 656,
although he "implicitly" ruled that FWB had obtained a
consensual lien. *Id.*

Thereafter, on December 8, 1995, FWB, Betz, and Sloan
filed the motion for summary judgment in Suit I. Also on
December 8, 1995, the remaining appellees moved to dismiss
with respect to Suit II.[13] It is these motions that are at issue
in this appeal.

With respect to the motion for summary judgment, appel-
lees submitted various exhibits to their comprehensive legal
memorandum, including court transcripts and opinions from
the bankruptcy court. Appellees argued, *inter alia,* that
"[t]he issue [of fraud] has been conclusively decided by the
Bankruptcy Court and the finding of fact by that Court has

---

13. The Record Extract does not contain a copy of the motion to dismiss.
The motion is in the court file, however. The appellees sought dismiss-
al of Suit II on the ground that the Trustee was the only person with
authority to administer the estate, and appellants "lacked the statutory
and specific authority from the Chapter 7 Trustee to file [Suit II]."
Although the court granted their motion, it did not do so on the grounds
asserted by appellees.

preclusive effect on this proceeding under the principles of both *res judicata* and collateral estoppel." Moreover, they contended that appellants could not relitigate fraud in State court, because it was an issue they should have raised in trying to defeat the Bank's security interest. Thus, they asserted that Judge Keir's finding of a perfected security interest in favor of FWB as to the Shearson Account barred appellant's State law claims. In their legal memorandum, appellants argued:

> *Res judicata* bars the Richmans' fraud claims in this case as that issue was conclusively decided by the Bankruptcy Court in the Turnover Action. In that case, the ultimate issue of fact that was decided was whether FWB properly obtained a security interest in the Shearson Account which is, of course, the same factual issue that is the basis for the fraud claim. The Bankruptcy Court ruled that FWB did indeed act properly. Implicit in that decision is the critical determination that no fraud was committed on the Richmans, an act that would have obviously invalidated the security interest in the Shearson Account.

> \* \* \*

> The concept of collateral estoppel is equally applicable to the instant case.

> \* \* \*

> The Richmans have had their "day in court" on the issue of fraud. ... It would be both inappropriate and grossly unfair to the parties in this case to have to relitigate an issue that could have been, should have been, and was required to have been raised in the Bankruptcy Court. To allow litigation of the fraud issue in the instant case would be a classic "second bite at the apple."

> The third issue is the essentialness of the factual determination to the final judgment in the prior proceeding. An allegation of fraud was totally essential to a ruling from the Bankruptcy Court on the issue of whether FWB properly obtained a lien on the Shearson account. Success on the fraud issue would have resulted in victory for the Richmans

in the Turnover Action. Therefore, it was integral to the Bankruptcy Court's ruling in favor of FWB that any and all possible defenses to the bank's interest in the Shearson Account were rejected—the most critical of which would have been the allegation of fraud on the part of FWB.

In their opposition, appellants cried "ambush." They asserted, *inter alia,* that "the fraud claim which [appellees] seek to preclude was expressly referred to this [circuit] court for determination in a jury trial by the Honorable Judge E. Stephen Derby of the federal bankruptcy court." Further, they argued generally that claim preclusion embraces due process notions of fundamental fairness; they did not expect the bankruptcy court to adjudicate the issue of fraudulent inducement concurrently with the security interest issue, nor did the court need to do so. Appellants also noted that it was appellees who had earlier argued that disposition of the Turnover Action was premature, because of the pending State action. Additionally, appellants claimed that they were entitled to their day in court, because they "adhered to the direction of the bankruptcy court" and proceeded "under the express direction of the bankruptcy court to adjudicate their fraud claims in state court." Notwithstanding the agreement of the court and all parties that the fraud claims were to be adjudicated in State court, appellants claimed that the Bank sought "to rewrite history and to blindside the Richmans...."

The circuit court held a hearing on the motions on February 5, 1996. In a Memorandum Opinion and Order dated February 24, 1997 (filed March 19, 1997), the circuit court (Thompson, J.) granted appellees' motions. The circuit court agreed with appellees that "[f]raud is clearly the linchpin of [appellants'] case," and recognized that "[t]he crux of FWB's motion for summary judgment is that the issue of fraud may not be litigated in the State court case because doctrines of *res judicata* (or claim preclusion ... ) bar such litigation." [14]

---

**14.** The court indicated in its opinion that it would use the term *"res judicata"* generally to refer to the preclusion issues raised in the

The court rejected appellants' argument that they were not obligated to assert fraud in the Turnover Action because, conceptually, the contention was in the nature of a "permissive" counterclaim. Employing the transaction analysis to analyze appellants' claims, the court concluded:

> The court is satisfied that the Turnover action adjudicated the respective rights to the Shearson account proceeds. The Richmans may not now challenge such an adjudication on new grounds when they had opportunity in fact to prosecute such claims in the action that resulted in the adjudication at issue. The court is satisfied that the Richmans are now barred from asserting their fraud claims in the Circuit Court for Montgomery County in as much [sic] as those fraud claims involve the transactions surrounding the Shearson Lehman account.

(Footnote omitted).

In order to understand the basis of the circuit court's decision, which we must review on appeal, we quote at length from the thirty-two page opinion:

> The Richmans instituted the Turnover action. Furthermore, *the Turnover action concerned exactly those assets that are the subject of the Bank's alleged fraud* [emphasis in trial court opinion]. Whether the Bank presents an "offensive"-type defense to that turnover claim is irrelevant to the Richmans' obligation to forge ahead along all possible avenues to relief. To hold back any possible allegation or claim, especially concerning the specific transaction at issue in the Turnover action, only reduces the chances of securing relief on their petition. As the instigators of litigation, they do so at their peril.

> \* \* \*

> [T]he court is more than satisfied that the consideration of res judicata principles in connection with the facts of this case is proper. *The Richmans fall squarely within that*

motion. The broad use of the term *res judicata* creates some confusion with regard to the issue of collateral estoppel, however.

*class of plaintiffs for whom the procedural system provides ample opportunity to develop all possible theories of relief.*

\* \* \*

Furthermore, the claims that the Richmans are pressing all revolve around the Shearson Account. The alleged fraud is entirely entwined with the events and circumstances concerning the Shearson Account that took place between the Richmans, the Bank and the individual defendants. The loan Modification and the questioned collateral arrangements surrounding it are certainly a single transaction. At the very least they are a series of interrelated transactions. . . .

Finally, the entire transaction at issue, whether it be the overall Modification of the original loan agreement or the more narrow arrangement surrounding the Shearson Account, certainly is such that it may be said to form a convenient trial unit. It would make no sense to litigate in piecemeal fashion all of the different, discrete issues that surround any deal or transaction gone bad. All of the actors that took part in the transaction were the same throughout. The series of separate deeds that comprise the transaction took place in a relatively compacted timeframe and were restricted to a single geographic area. The situation, both temporal and spatial, is a limited and discrete one. The situation thus presented is one where it is undeniable that the dealings surrounding the Shearson Account are all related in time, space, origin and motivation.

\* \* \*

*The Richmans in this case were afforded a full and fair opportunity to litigate.* As outlined above, the Bankruptcy proceeding was conducted under the modern and expansive Federal Rules of Civil Procedure. The Turnover action was not a summary procedure designed as a quick and easy substitute for "full blown" litigation. To the contrary, *the Turnover action had all the characteristics of any comprehensive lawsuit; including the opportunity to assert any and all claims by the one initiating the action,* the opportu-

nity for the one defending the action to assert any counter-claims, and the opportunity for an appeal from the final decision. *In no way could the Richmans claim that they did not have full and fair opportunity. . . .*

\* \* \*

*The Richmans' assertion that lack of participation and/or privity on their part dooms FWB's res judicata defense is faulty.* The Court is not persuaded that conversion of the Richmans' bankruptcy from Chapter 11 to Chapter 7 caused the prosecution of the Turnover action to change in any way. It certainly did not cause the nature of the proceeding to change in any way that might be called fundamental. The Turnover action was instituted by the Richmans themselves under the auspices of Chapter 11. The ultimate goal of the Turnover action was to secure the proceeds of the Shearson Account for the bankruptcy estate. This goal, the ultimate relief sought, has not changed one iota since the installation of Mr. Wolff as trustee. The relief sought is, and has remained, the same: turnover of the Shearson monies.

\* \* \*

In this case, the Richmans and the trustee had exactly the same interest in the object of the suit. They both wanted the proceeds of the Shearson account, *for the benefit of the bankruptcy estate* [emphasis in trial court opinion].

\* \* \*

As a matter preliminary to the actual determination of whether or not fraud was, or should have been, litigated in the Turnover action, the Court first considers the Richmans' argument that they expressly avoided alleging fraud in the Turnover action because of rulings by Judge Derby of the Bankruptcy Court. The Richmans allege that Judge Derby, in two rulings, one dated 22 April, 1993 and one dated 23 February, 1994, restricted the issues in the Bankruptcy court such that all matters of a state law nature must first be determined by the Circuit Court in the state case. In effect, the claim is that Judge Derby abstained from hearing

any matters that should be decided by the state court under state law. According to this argument, the Richmans did not allege their fraud claims in the Turnover action because Judge Derby directed them not to raise such state-law issues like fraud.

Several problems with this argument by the Richmans are apparent. The first problem with this argument is that Judge Derby's order dated 22 April, 1993, supposedly directing that no state fraud issues would be entertained, was not even entered in the Turnover action.[8] This 1993 order was entered under the rubric of the Discharge action filed by FWB. It was in connection with the Discharge action, not the Turnover action, that, Judge Derby issued his April 1993 ruling. The Richmans' reliance upon this order, therefore, is misplaced.

---

Judge Thompson's footnote 8:

As review, there was an adversary proceeding filed by the Bank. This was the so-called "discharge action." In it the Bank alleged fraud on the part of the Richmans. It must be remembered that the discharge action was filed, argued and finally determined prior to the Turnover action.

The second problem with the Richmans' arguments that Judge Derby somehow forbade an allegation of fraud in the Turnover action is far more damaging. *The Richmans place great emphasis on Judge Derby's 23 February, 1994 order in which he supposedly abstained from hearing any state law claims. This order was, indeed, entered as part of the Turnover action.* However, for the Richmans to claim that this order is what prevented them from alleging their fraud claims in the Turnover complaint is simply ridiculous. *The order was entered almost one year after the filing of the Turnover complaint.* How can an order eventually become the basis for an assertion that the plaintiff was not allowed to allege certain matters in a complaint when the order was not even in existence at the time of the filing of said complaint? It cannot.

A second flaw in the Richmans' argument based on Judge Derby's February, 1994 order is the fact that *nowhere in*

*his order does he expressly limit the issues to be raised in the Turnover complaint.* The order only abstains from hearing any portion of the adversary proceeding (the Turnover action) until litigation then pending in the state court between the parties is resolved. It does not <u>in any way</u> limit the scope of the Turnover proceeding nor does it forbid the allegation of certain causes of action. It merely expresses a time frame in which the judge wanted to take up the proceeding. Abstaining from the hearing of certain issues at a certain time does not necessarily result in an abstention as to those issues for all time. . . .

*　　*　　*

The Richmans correctly point out that fraud issues were never actually "litigated" in the Turnover action. They decided not to raise such a claim in the Turnover complaint and even expressed during several phases of the proceedings, that such a claim was not then before the Bankruptcy court. Therefore, it is true that a state law fraud analysis was never argued before the Bankruptcy court. This is not to surmise that such issues were not contemplated by Judge Derby or Judge Keir as they rendered their various decisions, but only to state at the outset that the Court does not feel that fraud was "actually litigated" in the Bankruptcy court. This, however, does not save the Richmans from the Bank's res judicata defense. The Court is more than satisfied that, while not actually litigated, fraud most definitely *should have been litigated. The Richmans had their chance to argue such a cause of action and chose not to.* Again, as the instigators of litigation proceedings, they did so at their peril.

(Italics added; underlining in original) (footnote omitted).

In reaching his conclusion, it is significant that Judge Thompson omitted any reference to the federal counterclaim filed by appellants in the Discharge Action. The claims in the federal counterclaim, as we noted, were identical to the State fraud claims that are the subject of Judge Thompson's *res judicata* ruling. In essence, appellants alleged in both actions

that appellees fraudulently induced them to execute the Hypothecation Agreement.

We will include additional facts in our discussion.

## STANDARD OF REVIEW

Maryland Rule 2–501, which governs summary judgment, contemplates a two-level inquiry. It requires that, in order to grant summary judgment, the trial court must determine that no genuine dispute exists as to any material fact, and that one party is entitled to judgment as matter of law. *Bagwell v. Peninsula Regional Medical Ctr.*, 106 Md.App. 470, 488, 665 A.2d 297 (1995), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996); *see also Southland Corp. v. Griffith*, 332 Md. 704, 712, 633 A.2d 84 (1993); *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 737–38, 625 A.2d 1005 (1993); *Bits "N" Bytes Computer Supplies, Inc. v. Chesapeake & Potomac Tel. Co.*, 97 Md.App. 557, 580–81, 631 A.2d 485 (1993), *cert. denied*, 333 Md. 385, 635 A.2d 425 (1994); *Seaboard Sur. Co. v. Richard F. Kline, Inc.*, 91 Md.App. 236, 242–45, 603 A.2d 1357 (1992). In its review of the motion, the court must consider the facts in the light most favorable to the non-moving party. *Dobbins v. Washington Suburban Sanitary Com'n*, 338 Md. 341, 345, 658 A.2d 675 (1995); *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985). It must also construe all inferences reasonably drawn from those facts in favor of the non-movant. *Tennant v. Shoppers Food Warehouse*, 115 Md.App. 381, 387, 693 A.2d 370 (1997); *Bagwell*, 106 Md.App. at 488, 665 A.2d 297.

To defeat a motion for summary judgment, the non-moving party must establish that a genuine dispute exists as to a material fact. *Moura v. Randall*, 119 Md.App. 632, 640, 705 A.2d 334, *cert. denied*, 349 Md. 495, 709 A.2d 140 (1998). A material fact is one that will somehow affect the outcome of the case. *King*, 303 Md. at 111, 492 A.2d 608. If a dispute exists as to a fact that is not material to the outcome of the case, the entry of summary judgment is not foreclosed. *Scroggins v. Dahne*, 335 Md. 688, 691, 645 A.2d 1160 (1994). Moreover, mere formal denials or general allegations are not

necessarily sufficient to prevent the entry of summary judgment. *Shaffer v. Lohr*, 264 Md. 397, 404, 287 A.2d 42 (1972); *Frush v. Brooks*, 204 Md. 315, 320–21, 104 A.2d 624 (1954).

In the absence of a genuine dispute as to material fact, we must decide if the trial court reached the correct legal conclusion. *Beatty*, 330 Md. at 737, 625 A.2d 1005; *see also Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 591, 578 A.2d 1202 (1990); *King*, 303 Md. at 111, 492 A.2d 608. Appellate courts ordinarily review the grant of summary judgment "only on the grounds relied upon by the trial court." *Blades v. Woods*, 338 Md. 475, 478, 659 A.2d 872 (1995); *see Hoffman v. United Iron and Metal Co., Inc.*, 108 Md.App. 117, 132–33, 671 A.2d 55 (1996).

## DISCUSSION

We must determine whether the circuit court erred in concluding that appellants' State fraud claims are barred by *res judicata* as a result of the bankruptcy court proceedings. The doctrine of *res judicata* provides that

"a judgment between the same parties and their privies is a final bar to any other suit upon the same cause of action, and is conclusive, not only as to all matters that have been decided in the original suit, but as to all matters which with propriety could have been litigated in the first suit...."

*deLeon v. Slear*, 328 Md. 569, 580, 616 A.2d 380 (1992) (quoting *Alvey v. Alvey*, 225 Md. 386, 390, 171 A.2d 92 (1961)); *see Rowland v. Harrison*, 320 Md. 223, 229, 577 A.2d 51 (1990); *Warner v. German*, 100 Md.App. 512, 518, 642 A.2d 239 (1994).

█ In our view, a critical element of *res judicata* was not satisfied here; appellants' fraud claims were never litigated in the prior bankruptcy action, nor, with propriety, could they have been. Therefore, we hold that appellants' fraud claims are not barred in State court by *res judicata*. We explain.

Appellants assert that the bankruptcy proceedings are not *res judicata* as to their State claims, because the claims in federal and State court are not identical. Moreover, they

complain that because the bankruptcy court originally abstained from considering the State law claims, they have been denied the opportunity to pursue their fraud claims to judgment in either forum. Appellants also assert that, in the Turnover Action, Judge Keir was only to consider whether FWB's lien comported with the requirements of the Uniform Commercial Code, which could have been adjudicated without "jeopardizing" appellants' distinct State law claims. For their part, appellees assert that the Richmans failed to raise their fraud claims in the Turnover Action to defeat the Bank's claim of a security interest in the Shearson Account, despite the opportunity and the obligation to do so. Appellees also claim that the same set of operative facts permeates the federal and State cases; each side has cried foul with regard to the hypothecation of the Shearson Account.

█ It is well established that the doctrine of *res judicata,* a common law affirmative defense, bars the relitigation of matters previously litigated between parties and their privies. *Gertz v. Anne Arundel County,* 339 Md. 261, 269, 661 A.2d 1157, *cert. denied,* 516 U.S. 990, 116 S.Ct. 522, 133 L.Ed.2d 429 (1995); *deLeon,* 328 Md. at 580, 616 A.2d 380; *see also* R. Jason Richards, *Richards v. Jefferson County: The Supreme Court Stems the Crimson Tide of Res Judicata,* 38 *Santa Clara L.Rev.* 691, 695 (1998). *Res judicata* also extends to claims that could have been asserted and litigated in the original suit. *Esslinger v. Baltimore City,* 95 Md.App. 607, 627, 622 A.2d 774, *cert. denied,* 331 Md. 479, 628 A.2d 1066 (1993); *see Scott v. Prince George's County Dep't of Social Servs.,* 76 Md.App. 357, 374, 545 A.2d 81, *cert. denied,* 314 Md. 193, 550 A.2d 381 (1988), *and cert. denied,* 492 U.S. 910, 109 S.Ct. 3226, 106 L.Ed.2d 575 (1989).

█ *Res judicata,* which is sometimes referred to as claim preclusion, and the related but narrower concept of collateral estoppel or issue preclusion, are both "branches of a doctrine known as estoppel by judgment[.]" *Klein v. Whitehead,* 40 Md.App. 1, 13, 389 A.2d 374 (1978). The doctrine of preclusion helps to avoid " 'the expense and vexation attending

multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibilities of inconsistent decisions.' " *Murray Int'l Freight Corp. v. Graham,* 315 Md. 543, 547, 555 A.2d 502 (1989) (quoting *Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)).

In analyzing the applicability of *res judicata,* a court must consider the following elements:

(1) whether the parties are the same as, or in privity with, the parties to the earlier dispute;

(2) whether the cause of action presented is identical to the one determined in the prior adjudication; and,

(3) whether there was a final judgment on the merits in the initial action.

*deLeon,* 328 Md. at 580, 616 A.2d 380; *see Lone v. Montgomery County,* 85 Md.App. 477, 490–91, 584 A.2d 142 (1991). In contrast, under the doctrine of collateral estoppel, "only those determinations of fact or issues *actually litigated* in the first case are conclusive...." *MPC, Inc. v. Kenny,* 279 Md. 29, 33, 367 A.2d 486 (1977) (emphasis added). In a subsequent suit between the same parties or their privies, collateral estoppel may foreclose relitigation of an issue of fact or law that was previously decided by a court of competent jurisdiction. *See Klein,* 40 Md.App. at 15, 389 A.2d 374.

Decisions rendered by a bankruptcy court are entitled to preclusive effect. *Deitz v. Palaigos,* 120 Md.App. 380, 395 n. 5, 707 A.2d 427 (1998); *see also Klein,* 40 Md.App. at 17, 389 A.2d 374. Ordinarily, when determining the preclusive effect of a federal court decision on a state court proceeding, federal law applies. *Brooks v. Arlington Hosp. Ass'n,* 850 F.2d 191, 195 (4th Cir.1988); *Douglas v. First Security Federal Savings Bank,* 101 Md.App. 170, 179, 643 A.2d 920, *cert. denied,* 336 Md. 558, 649 A.2d 601 (1994), and *cert. denied,* 514 U.S. 1128, 115 S.Ct. 2001, 131 L.Ed.2d 1002 (1995). Nevertheless, "when the application of *res judicata* touches substantive state law issues, such as privity or the legal relationships of parties ... state law applies." *Douglas,* 101 Md.App. at 179,

643 A.2d 920; *see Brooks,* 850 F.2d at 195 (stating that "A federal court should apply the federal doctrine of *res judicata* unless the application of *res judicata* touches an important question of state law, such as privity"); *Harnett v. Billman,* 800 F.2d 1308, 1313 (4th Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 763 (1987) (stating that "where the application of res judicata rules does not touch upon an important question of state law such as privity, we will apply federal rules of decision to measure the preclusive effect of the judgment"); *Spiker v. Capitol Milk Producers Cooperative, Inc.,* 577 F.Supp. 416, 418 (W.D.Va.1983) (recognizing that "state *res judicata* [may apply] where the principles in question concern substantive rather than procedural policies").

Both the federal courts and Maryland have adopted the "transaction test" to determine identity of causes of action. *See In re Varat Enterprises, Inc.,* 81 F.3d 1310, 1316 (4th Cir.1996); *Harnett,* 800 F.2d at 1314; *Adkins v. Allstate Ins. Co.,* 729 F.2d 974, 976 (4th Cir.1984); *deLeon,* 328 Md. at 589–90; *Kent County Bd. of Educ. v. Bilbrough,* 309 Md. 487, 494, 525 A.2d 232 (1987); *Douglas,* 101 Md.App. at 188, 643 A.2d 920. In *Bilbrough,* 309 Md. at 499, 525 A.2d 232, the Court analyzed the term "claim" for purposes of merger, bar, and *res judicata.*

Traditionally, when two causes of action involved the same evidence or proof, they were considered identical claims and, therefore, the second might be barred. *Bilbrough,* 309 Md. at 493, 525 A.2d 232 (citing *MPC, Inc.,* 279 Md. at 33, 367 A.2d 486). But the *Bilbrough* Court rejected the exclusive use of the "same evidence" or "required evidence analysis to determine if the same claim is involved in two actions." *Id.* at 494, 525 A.2d 232; *see also Patel v. HealthPlus, Inc.,* 112 Md.App. 251, 273, 684 A.2d 904 (1996).

In resolving "the same claim-separate claim conundrum," *id.* at 497, 525 A.2d 232, the *Bilbrough* Court generally adopted the transaction test, stating:

> "The present trend is to see claim in factual terms and to make it coterminous with the transaction regardless of the

number of substantive theories, or variant forms of relief flowing from those theories, that may be available to the plaintiff; regardless of the number of primary rights that may have been invaded; and regardless of the variations in the evidence needed to support the theories or rights. The transaction is the basis of the litigative unit or entity which may not be split."

*Bilbrough,* 309 Md. at 497–98, 525 A.2d 232 (quoting *Restatement (Second) Judgments* (1982), § 24 cmt. a). Section 24 of the Restatement provides, in part:

What factual grouping constitutes a 'transaction', and what groupings constitute a 'series', are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

*See also Shum v. Gaudreau,* 317 Md. 49, 57–58, 562 A.2d 707 (1989) (stating that claim preclusion bars a second action "if treatment of all the claims as a unit conformed to the parties' expectations or business usage").

■ Of particular significance to us, however, is the acknowledgment by the *Bilbrough* Court, and others, that " '[e]quating claim with transaction ... is justified only when the parties have ample procedural means for fully developing the entire transaction in the one action going to the merits....' " *Bilbrough,* 309 Md. at 499, 525 A.2d 232 (quoting *Restatement (Second) of Judgments,* at 198); *see, e.g., Southmark Properties v. Charles House Corp.,* 742 F.2d 862 (5th Cir.1984). Indeed, as one commentator has cogently explained, *res judicata* does not apply

when its application will offend the ends of equity and fairness.... [I]t is a prerequisite to the application of res judicata principles that a party be provided the "full and fair opportunity to litigate" the preceding case.

\* \* \*

> [I]t is a fundamental prerequisite of res judicata that the [full and fair opportunity] doctrine at least be considered before res judicata attaches.

*Richards, supra,* 38 *Santa Clara L.Rev.* at 698–99 (citing, *inter alia, Montana v. United States,* 440 U.S. at 153, 99 S.Ct. 970; *Allen v. McCurry,* 449 U.S. 90, 95, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)). The "full and fair opportunity" concept provides the guiding framework for our analysis.

In the context of this case, it is evident that *res judicata* can only apply as a bar to the Richmans' State claims if: 1) appellants or their privies previously litigated their State fraud claims in federal court with the same parties or their privies; or 2) appellants, with propriety, could have litigated the State claims in federal court. It is undisputed that appellants did not actually litigate their fraud claims in federal court, and Judge Thompson so found. Therefore, we must focus on whether, "with propriety," appellants could have asserted and pursued their State fraud claims in the Turnover Action that they initiated immediately after Judge Derby dismissed appellants' federal counterclaim asserted in the Discharge Action. This is where we part company with Judge Thompson, who, in turn, presumably relied on Judge Keir, Judge Williams, and appellees; they all concluded that the Richmans had every opportunity to assert fraud in the Turnover Action, but failed to do so. In our view, appellants did not have a full and fair opportunity to litigate their State fraud claims in federal court.

The centerpiece of the analysis of Judge Keir, Judge Williams, and Judge Thompson is the implicit conception of the Turnover Action and the Discharge Action as entirely discrete and unrelated matters. In the various rulings that we have reviewed, only Judge Keir actually discussed the nature of an adversary proceeding. In his decision of July 21, 1995, Judge Keir said:

> An adversary proceeding is a federal lawsuit between parties, plaintiff and defendant. Indeed, Fed. Rule Civil Proc. 3—Commencement of Action—applies in adversary

proceedings pursuant to FRBP 7003. Thus, an adversary proceeding is commenced by filing a complaint with the court. After conversion of the bankruptcy case from Chapter 11 to Chapter 7, the parties to the adversary were as follows: Michael Wolff, as Chapter 7 Trustee, was the substituted plaintiff entitled to prosecute this turnover action and FWB Bank remained the proper defendant.

Moreover, at the hearing before Judge Thompson on the summary judgment motion at issue here, the Bank's attorney said: "In the [appellants'] opposition, there is a mixing, if you will, of the dischargeability litigation, which has nothing to do with the turnover litigation."

Thus, in assessing appellants' failure to aver fraud in the Turnover Action, Judge Thompson, like Judge Keir, Judge Williams, and appellees, essentially disregarded appellants' fraud counterclaim in the Discharge Action and Judge Derby's unequivocal rulings with respect to it. From their perspective, whatever appellants may have alleged in the Discharge Action was of no consequence in the Turnover Action. By compartmentalizing the Discharge Action and the Turnover Action, as if they were completely unrelated, they created a fiction that the events in the Discharge Action were not relevant to the events in the Turnover Action; that view led to the ultimate conclusion that appellants could have pursued their State fraud claim in the Turnover Action.

No authority has been cited to us for the proposition that two adversary proceedings, lodged in the same bankruptcy case, involving the same parties, are nonetheless totally distinct and discrete cases, each to be considered in a vacuum. Our research suggests otherwise.[15]

A bankruptcy case ordinarily " 'refers to a litigated matter arising within a case during the course of administration of an estate. The term "case" therefore refers to the overall spec-

---

**15.** We acknowledge that appellants did not argue either here or below that the Discharge and Turnover proceedings should be considered together in determining whether *res judicata* applies to the State case. Nevertheless, we believe that the issue is subsumed in the matters that were raised.

trum of legal action taken under one of the debtor relief chapters. It is the widest term functionally. The term "proceeding," by contrast, refers to any subaction raised or commenced within the case[.]' " 2 *Collier on Bankruptcy* ¶ 301.03 (15th ed.1996) (citation and footnote omitted).

> Generally, in the bankruptcy context, the word "case" is a term of art which refers to "that which is commenced by the filing of a petition; it is the 'whole ball of wax,' the chapter 7, 9, 11, 12, or 13 case." 5 COLLIER ON BANKRUPTCY ¶ 1109.02 (15th ed.1993). Adversary proceedings, on the other hand, are subactions which are raised within a "case" and are commenced by the filing of a complaint. *See* Fed.R.Bankr.P. 7003, incorporating Fed.R.Civ.P. 3; 2 COLLIER ON BANKRUPTCY ¶ 301.03 (15th ed.1994)[.]

> \* \* \*

> "The term [bankruptcy case] embraces all controversies determinable by the court of bankruptcy and all matters of administration arising during the pendency of the case. . . . The word 'proceeding' as used in [the bankruptcy] rules generally refers to a litigated matter arising within a case during the course of administration of an estate."

*In re Blevins Electric, Inc.*, 185 B.R. 250, 253–54 (Bankr. E.D.Tenn.1995) (quoting 2 COLLIER ON BANKRUPTCY ¶ 301.03 (15th ed.1994)) (some citations omitted).

*Cohen v. Bucci,* 905 F.2d 1111 (7th Cir.1990), is instructive. There, the court said that "[a]dversary proceedings in bankruptcy are not distinct pieces of litigation; *they are components of a single bankruptcy case* [.]" *Id.* at 1112 (emphasis added). *See also In re Shearer,* 167 B.R. 153, 156 n. 1 (Bankr.W.D.Mo.1994) (stating that "a 'case' in Bankruptcy is commenced by the debtor's filing of a bankruptcy petition, and any subsequent litigation . . . is simply a part of the case as a whole"); *Berge v. Sweet,* 37 B.R. 705, 706 (Bankr.W.D.Wis. 1983) ("A bankruptcy 'case' commences with the filing of a petition . . . and may include a number of adversary proceedings . . . and 'contested matters' "). *But cf.* Daniel R. Cowans, *Bankruptcy Law and Practice* § 3.19(a), at 308 (6th ed. 1994) ("Adversary proceedings are contemplated to be a sepa-

rate piece of litigation under the overall bankruptcy case, *i.e.*, in the nature of an independent action.").

It follows that the Discharge Action and the Turnover Action constituted subactions within the overall framework of appellants' bankruptcy case. *See also* Bankr.Rule 7001. Therefore, we reject what we see as the approach of Judge Thompson and our federal colleagues (as well as appellees); their opinions implicitly hinged on the view that Judge Derby's orders in the Discharge Action pertained solely to the Discharge Action, and had no effect on appellants' course of action in the subsequent Turnover Action.

Judge Thompson, like Judge Keir, seemed to attach great weight to the fact that Judge Derby's abstention order of February 1994 in the Discharge Action could not have been the reason that appellants failed to plead fraud in the Turnover Action; the Turnover Action was filed *before* the February 1994 order was issued. When Judge Derby's February 1994 order is analyzed in conjunction with Judge Derby's April 1993 orders, however, the reason for appellants' failure to plead fraud in the Turnover Action is abundantly clear. The April 1993 orders, which we recounted earlier in detail, were issued just one day before the filing of the Turnover Action. In the April 1993 orders, Judge Derby dismissed appellants' federal counterclaim alleging fraud with regard to the Hypothecation Agreement. This suggests to us that Judge Thompson, like our federal colleagues, overlooked the significant temporal connection between the dismissal of the Discharge Action and the filing of the Turnover Action. The omission of any fraud allegations in the Turnover Action was obviously tied to Judge Derby's directives just one day before, when he opted to abstain and dismissed the pendent State fraud claims.

 Because each adversary proceeding was a component of the same bankruptcy case, *res judicata* analysis required consideration of both subactions. When we consider the two adversary proceedings together, we are in a position to assess appellants' actions realistically, in light of events that actually

transpired. We conclude that the filing of the federal counter-claim in the Discharge Action, coupled with the abstention and dismissal orders, was sufficient to protect appellants from a finding of *res judicata* with regard to the same claims in State court. As a consequence of Judge Derby's abstention and dismissal of the federal counterclaim, appellants were denied an opportunity to litigate their fraud claims in federal court.

Judge Derby's orders of April 1993 indisputably fostered appellants' belief that the bankruptcy court would not enter-tain appellants' State fraud counts, whether in the Discharge Action or the Turnover Action. At the very least, in consider-ing whether, "with propriety," appellants were able to litigate their State claims in federal court, it was certainly reasonable for appellants to believe that they were required by Judge Derby to pursue their fraud claims in State court.

Similarly, Judge Keir determined to proceed with the Turn-over Action, after discussions with counsel in August and November 1994 indicating that the State court had resolved matters pertaining to the Turnover Action. Based on these discussions, appellants understandably, but incorrectly, thought that the only matter that Judge Keir would resolve concerned satisfaction of the technical requirements for cre-ation of a perfected security interest.

Consistent with that view, at the March 7, 1995, hearing before Judge Keir regarding pending motions for summary judgment in the Turnover Action, appellants advised the court that they reserved their right to argue fraud in the procure-ment of the Hypothecation Agreement. It was at that point that Judge Keir stated that he did not "believe the allegation of fraud [was] before this Court in this adversary proceeding any longer." Rather, he thought that the issue of fraud had been resolved by the State court when it found there "wasn't the basis of fraud necessary to get an [attachment before judgment] under state law." Yet the resolution of issues concerning the attachment before judgment did not dispose of all the fraud issues timely asserted by appellants in the counterclaims that they filed in both State and federal court.

To the extent that Judge Keir, and later Judge Thompson, believed that Judge Derby only referred to the State court the dispute concerning the attachment before judgment, they were wrong. That view is contradicted by Judge Derby's orders relating to the dismissal of the federal counterclaim.

The case of *Lone v. Montgomery County*, 85 Md.App. 477, 584 A.2d 142, underscores for us that *res judicata* does not apply, because appellants did not have the opportunity to litigate their fraud claims in federal court. We pause to discuss *Lone*.

In *Lone*, the county council enacted an ordinance that prohibited certain uses of homes. But the ordinance also provided for a ten year "grace period" for qualified owners, which permitted the continuation of the prohibited uses during that period. At the end of the grace period, the county began to enforce its ordinance. As a result, some property owners filed a declaratory judgment action in federal court, claiming federal and Maryland constitutional violations. The federal trial judge upheld the ordinance based on federal law, but declined to consider the pendant claims asserted under Maryland law. The Fourth Circuit thereafter affirmed. *Lone*, 85 Md.App. at 483, 584 A.2d 142.

Subsequently, the county began to institute suits against individual property owners under the ordinance, seeking injunctive relief and fines. In a consolidated appeal, we agreed with the trial judge that as to Jones, one of the property owners, "the finality . . . of the Maryland provisions simply is not there." *Id.* at 493, 584 A.2d 142. Judge Cathell, writing for this Court, cogently explained:

We first note that the appellant in the case at bar did not have her day in court with respect to the constitutionality of [the Ordinance] under the Maryland Constitution. The federal district court, although it had "pendent jurisdiction" over Maryland constitutional law issues, dismissed those claims without prejudice. In *Ellett v. Giant Food, Inc.,* [66 Md.App. 695, 505 A.2d 888 (1986) ], we said res judicata bars causes of action previously asserted and causes of action that with *propriety might have been asserted in a former*

*suit.* Indeed, **the appellant in the case at bar did ask the federal district court to consider the Maryland constitutional law claims, which with all propriety, the federal court might have considered under its pendent jurisdiction.** The federal district court, however, dismissed the Maryland constitutional law issues without prejudice because: "[the court] think[s] in the interest of judicial economy, [that] fairness, and convenience are well served by letting any claims that the Plaintiff wants to assert, be asserted in the State Court." **It was no fault of the appellant that the Maryland constitutional issues were not litigated in the first federal suit. Accordingly, the rationale of res judicata would not be applicable to the case at bar.** Furthermore, we said in *Annapolis Urban Renewal v. Interlink, Inc.,* 43 Md.App. 286, 289, 405 A.2d 313 (1979), that a "dismissal without prejudice is not, of course, an adjudication on the merits." (Footnote omitted.) **Thus, the third element [final judgment on the merits] of the res judicata test is not met as to the Maryland constitutional law claims.**

*Lone,* 85 Md.App. at 492–93, 584 A.2d 142 (italics in original; boldface added).

Thus, we held that the federal case, "which decided the constitutionality of [the Ordinance] under the federal Constitution was not res judicata as to the subsequent litigation in a Maryland court on the Maryland constitutional issues...." *Id.* at 488, 584 A.2d 142. What the *Lone* Court said resonates loudly here:

**[W]e hold that the doctrine of res judicata does not bar a subsequent suit in a Maryland court, alleging violation of Maryland Constitutional provisions, when the same parties had maintained a prior federal suit in which only federal constitutional issues were decided, and the federal court expressly deferred state constitutional questions to the state court.**

*Id.* at 494, 584 A.2d 142 (boldface added).

*Lone* applies logically and forcefully to the case *sub judice.* Although appellants timely lodged their fraud claims in the

Discharge Action, by way of a federal counterclaim, Judge Derby expressly declined to consider appellants' pendent State fraud claims. Instead, he abstained, deferring to the State courts for resolution of those claims. Consequently, he dismissed the federal counterclaim. As the appellants' claims were not decided in federal court, "the third element of the res judicata test is not met as to the Maryland [fraud] claims." *Lone*, 85 Md.App. at 493, 584 A.2d 142.

■■■ To be sure, we are not suggesting that Judge Keir had to abide by Judge Derby's decision abstaining from consideration of the State claims. A trial judge " 'is not bound by the prior ruling in the same case by another judge of the court....' " *Douglas*, 101 Md.App. at 176, 643 A.2d 920 (quoting *State v. Frazier*, 298 Md. 422, 449, 470 A.2d 1269 (1984)). That proposition, however, does not resolve this situation. Even if Judge Keir were entitled to revisit Judge Derby's rulings, however, this does not alter the fact that appellants were obligated to abide by Judge Derby's rulings until otherwise notified by the court.

■■■ We are mindful that "due process protection is a vital part of the day-in-court ideal." *Richards, supra*, 38 *Santa Clara L.Rev.* at 711. Indeed, "inherent in our many articulations of these elements [of res judicata] is the *due process requirement* that the initial claim was fully and fairly litigated." *Cassidy v. Board of Educ.*, 316 Md. 50, 57 n. 11, 557 A.2d 227 (1989) (emphasis added). Judge Derby's orders had the obvious effect of foreclosing appellants' opportunity to pursue their State fraud claims in federal court. If Judge Keir later determined to consider the State fraud claims, notwithstanding Judge Derby's earlier rulings, and he gave adequate notice to the parties of his change in the ruling, along with an opportunity to be heard, we would be presented with an altogether different circumstance. Without adequate notice and an opportunity to be heard, however, principles of fundamental fairness dictate that appellants should not be penalized for the course they followed in the Turnover Action. *See Richards v. Jefferson County, Alabama*, 517 U.S. 793, 797, 116

S.Ct. 1761, 135 L.Ed.2d 76 (1996) (concluding, in the context of nonparty preclusion, that petitioners were denied their right to due process under the Fourteenth Amendment, and stating "that extreme applications of the doctrine of res judicata may be inconsistent with a federal right that is 'fundamental in character' "); *Brown v. Felsen*, 442 U.S. 127, 131, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); *Hansberry v. Lee*, 311 U.S. 32, 37, 61 S.Ct. 115, 85 L.Ed. 22 (1940) (holding that Due Process Clause of Fourteenth Amendment would be violated when nonparties were bound by earlier litigation without adequate representation).

Judge Thompson, like Judge Keir, also considered it significant that Judge Derby never expressly precluded appellants from reasserting their fraud claims in the Turnover Action. This was yet another basis on which the circuit court concluded that appellants could have asserted their fraud claims in the Turnover Action. We see no merit in this view.

It is true that Judge Derby's several opinions and orders do not expressly prohibit appellants from alleging fraud in the Turnover Action. Nevertheless, we cannot endorse the strained and artificial construction of Judge Derby's orders or opinions advanced by appellees. Judge Derby could not have been clearer in articulating that the bankruptcy court would not consider appellants' fraud claims. Accordingly, he directed appellants to pursue their State fraud claims in the circuit court. That Judge Derby did not specifically prohibit appellants from making the same claims in another proceeding does not alter the meaning of that which he did express. It is illogical to conclude from what Judge Derby did say that he meant to allow that which he did not specifically forbid.

It is also noteworthy that, in his opinion of April 21, 1995, Judge Keir determined that Shearson did not have the right to disregard the Hypothecation Agreement. Judge Keir's ruling addresses the validity of the lien with respect to the requirements of the Uniform Commercial Code. It does not vitiate the importance of resolving appellants' fraud contentions, however. Nor do we believe that litigation of the fraud

claims in State court will necessarily undermine or nullify the finding of Judge Keir that the Hypothecation Agreement, as a transaction, comported with the requirements of the Uniform Commercial Code. *See Fairfax Savings, F.S.B. v. Kris Jen Ltd. Partnership,* 338 Md. 1, 655 A.2d 1265 (1995). Appellants' fraud claims are not dependent on whether the Hypothecation Agreement ultimately should have been honored by Shearson.

In an academic sense, it is, of course, important to ascertain whether the Hypothecation Agreement was enforceable as to Shearson, and technically valid insofar as the Bank was concerned. But the fact remains that, at the relevant time, when critical events were unfolding, the Bank and appellants were faced with an Hypothecation Agreement that Shearson would not honor. As a consequence, appellants were deemed in default of the Modification Agreement, and the Bank allegedly called the Loan. Appellants attribute their financial ruin to these circumstances. Moreover, they claim that appellees knew that Shearson would not honor the parties' agreement, but did not disclose this to appellants before they executed the Hypothecation Agreement. In this context, whether Shearson had the right to reject the Hypothecation Agreement is besides the point.

The case of *Selma Foundry and Supply Co., Inc. v. Peoples Bank and Trust Co.,* 598 So.2d 844 (Ala.1992), which is factually similar to the case at bar, is instructive. There, *Selma Foundry* appealed from the dismissal of a State suit on the grounds of *res judicata* and judicial estoppel.

After Selma Foundry filed for Chapter 11 bankruptcy, it filed a "motion for turnover" of its inventory and equipment from The Peoples Bank and Trust Company (the "Bank"), one of its creditors, which had repossessed the items in issue. The bankruptcy court denied Selma Foundry's motion for turnover, because the Bank held a perfected security interest in the items. Subsequently, Selma Foundry filed a disclosure statement and plan of reorganization that failed to mention any potential action against the Bank. Thereafter, Selma

Foundry, its president and sole shareholder, and its secretary filed suit in Alabama state court against the Bank. They alleged, *inter alia,* fraud, interference with business relations, conversion, and trespass. Six days later, Selma Foundry amended its disclosure statement to include information concerning the action instituted against the Bank. The Bank then removed the state suit to bankruptcy court. Ultimately, Selma Foundry's plan of reorganization was never approved and the bankruptcy proceedings were converted to a Chapter 7 liquidation. Accordingly, the bankruptcy court remanded the state claims to state court. In state court, the Bank moved to dismiss, asserting that Selma Foundry was precluded from pursuing its claims because it failed to raise them during the adversary hearing on the motion for turnover. The trial court dismissed the action, in part based on *res judicata.*

It is true that Alabama does not apply the Restatement's "same transaction" test to determine whether a prior action involved the same "cause of action" or "claim." Nevertheless, the Supreme Court of Alabama reversed and remanded. The court concluded that Selma Foundry's failure to raise its claims during the hearing on its motion for turnover did not preclude assertion of those claims in a state action. The court reasoned:

> A ruling on the "turnover proceedings" did not require a decision on the merits of Selma Foundry's present claims. Further, "turnover proceedings" are not the proper forum for litigation of tort claims. *In re FLR Co.,* 58 B.R. 632 (Bankr.W.D.Pa.1985).

*Selma Foundry,* 598 So.2d at 848.

The circuit court and appellees relied on *Southmark,* 742 F.2d 862, to support their position that *res judicata* precluded appellants' litigation of the State claims. As we see it, *Southmark* supports appellants' position, because the Fifth Circuit recognized that *res judicata* does not apply when, as here, a party is deprived of an opportunity to advance its contentions in the original suit.

Southmark Properties ("Southmark"), a real estate invest-
ment trust, provided financing in 1972 to Charles House
Corporation ("Charles") for construction of a residential devel-
opment in New Orleans. When Charles failed to make the
required loan payments, Southmark initiated foreclosure pro-
ceedings in Louisiana state court. It also brought suit in state
court against the guarantors to recover any deficiency. The
unsecured creditors of Charles filed a Chapter 10 reorganiza-
tion petition in federal court, in which Southmark filed a claim
as a secured creditor. Thereafter, Charles agreed to allow
Southmark to bid the balance due on its mortgage debt at a
reorganization trustee's sale, if Southmark would agree to
dismiss its State suits. The district court ordered the sale of
property at auction and permitted Southmark to bid the
balance due on its mortgage debt. The order also provided
that the property " 'shall be sold free and clear of all ...
claims.' " *Southmark*, 742 F.2d at 866. Thereafter, South-
mark acquired title to the property for the amount of the
outstanding debt. Pursuant to its agreement with Charles, it
then dismissed the state suits. The sale was confirmed by the
federal court, and the reorganization petition was dismissed in
1978. No appeal was taken.

In 1981, Charles filed suit against Southmark in state court,
alleging, *inter alia,* that "Southmark had violated its construc-
tion loan agreement ... by engaging in fraudulent and extor-
tionate activities leading to and including the initiation of the
April 1975 foreclosure proceedings and the subsequent reorga-
nization sale." *Southmark*, 742 F.2d at 867. Subsequently,
Southmark filed a declaratory action in federal district court
to establish that "its purchase ... was valid and that [Charles]
has no valid claim against Southmark." *Id.* Southmark also
asked the court to "enjoin" Charles "from prosecuting pending
or future claims" predicated upon the trustee's sales. *Id.*
Charles then filed a counterclaim that was almost identical to
the claims it initiated in state court. After the federal court
granted summary judgment in favor of Southmark, Charles
appealed.

The Fifth Circuit held that "the judgment of the district court ordering and confirming the sale and transfer of title of the property to Southmark are *res judicata* as to the claims asserted by appellants." *Southmark,* 742 F.2d at 869. In reaching its conclusion, the court applied the transactional test of the *Restatement (Second) of Judgments* and determined that the State case involved the same causes of action as the reorganization proceeding. *Id.* at 870 (footnote omitted). The court explained:

> The central transaction involved in both the reorganization sale and appellants' present claim was the passing of title to and ownership of The Charles House property from The Charles House Corporation to Southmark in exchange for cancellation of the mortgage debt. Although appellants' present claim alleges various other acts of wrongdoing by Southmark, all of those acts are alleged to have produced or resulted from, and were integrally related to, the sale of the property to Southmark. They all involved a "common nucleus of operative facts." If appellants' challenge to Southmark's right to thus take ownership of the property was extinguished by the prior reorganization action, as we hold it was, then appellants' remedies against Southmark "with respect to all or any part of the transaction, *or series of connected transactions, out of which the action arose,*" also were extinguished. *Restatement (Second) of Judgments* § 24(1) (emphasis added).

*Id.* at 871.

That two matters involve the same transaction is not necessarily dispositive, however. The court continued:

> Because appellants' present claim and the prior judgment involved the same principal transaction, appellants' claim is barred by *res judicata, if the procedural system available to appellants in the reorganization proceedings permitted appellants to raise that claim in those proceedings. Appellants do not assert that they lacked such an opportunity, and they clearly did not. Appellants had an "absolute and*

*unlimited" right to be heard in the reorganization proceedings.*

* * *

If Southmark had violated the terms of its mortgage agreement with appellants, and had committed various fraudulent and unlawful acts with respect thereto, as appellants now allege, *appellants had ample opportunity to raise those facts as a defense to Southmark's claim,* and to request that the trustee assert whatever cause of action the debtor possessed in that regard against Southmark. *Appellants instead chose to forego any objections to the assertion of Southmark's secured claim, or the sale of The Charles House property to Southmark.* As a result, Southmark's interest was recognized by the trustee and Southmark was allowed to bid in its mortgage debt for the property, without opposition.... *Appellants cannot now undo a judicial decree which they had a full opportunity to contest, and chose not to.*

*Southmark,* 742 F.2d at 871–72 (emphasis added) (citations and footnote omitted).

The *Southmark* Court recognized that *res judicata* does not apply when the party has not had "ample opportunity" to litigate the claim. That is clearly the situation here. In marked contrast to the appellants in *Southmark,* here we have debtors who, at their first opportunity, filed a multi-count federal counterclaim alleging fraud based on State law. They were denied the opportunity to pursue their fraud claims in the bankruptcy proceedings, however, because the bankruptcy court determined to abstain, dismissed the federal counterclaim, and directed appellants to pursue their claims to conclusion in State court.

It is disingenuous for appellees to assert that appellants had the chance to litigate their fraud claims in bankruptcy court, but failed to do so. It was appellees who opposed appellants' motion for summary judgment on the Turnover Action precisely because the State case had not yet been resolved. It was also appellees, along with the trustee, who thwarted

appellants' efforts to bring the State case to trial by securing a postponement over appellants' vigorous objection. Ironically, had the circuit court case been tried when scheduled, the issue we confront here would not have surfaced.

In our view, a critical element of *res judicata* was not satisfied here; appellants' fraud claims were never litigated in the prior bankruptcy action, nor, with propriety, could they have been. Appellants were, in effect, judicially whipsawed when they initiated their fraud claims in federal court, the claims were subsequently dismissed by the federal court, and the circuit court later faulted them for not litigating the fraud claims in federal court. Therefore, we hold that appellants' fraud claims are not barred in State court by *res judicata.*

## CONCLUSION

The bankruptcy court's orders of April 22, 1993 and February 23, 1994, when considered together, along with Judge Derby's several corresponding opinions, lead ineluctably to the conclusion that all of the criteria for application of *res judicata* were not satisfied here. At the hearings before Judge Derby, and in his orders and opinions, Judge Derby acknowledged that he lifted the stay so that appellants could pursue their lender liability claims in State court. He also recognized that appellants' claims in State court were identical to those that they asserted in the federal counterclaim. Further, he believed that the State court was "both more familiar with and better able to deal with" the fraud issues. Thus, he ruled that the bankruptcy court would abstain from rendering a decision on the Richmans' pendent State claims, and he dismissed appellants' federal counterclaim.

The Turnover Action was filed by appellants the day after the bankruptcy court dismissed appellants' federal counterclaim. Appellants obviously heeded Judge Derby's exquisitely clear rulings of April 22, 1993; in light of those rulings, appellants did not reassert the same fraud claims in the Turnover Action that the bankruptcy court had just dismissed in the Discharge Action.

Thereafter, in the February 23, 1994 order, Judge Derby recognized the parties' ongoing dispute concerning the Hypothecation Agreement, and again determined that the bankruptcy court would abstain until after the resolution of the State court proceedings. Indeed, he stated that the bankruptcy court would then apply those rulings "to complete the administration of this estate under bankruptcy law."

We acknowledge Judge Thompson's commendable effort to wade through the extensive record in reaching his result, particularly when the proverbial road on which he traveled was not always well lighted. Nevertheless, in light of Judge Derby's rulings, we cannot sustain the circuit court's conclusion. On this record, we decline to fault appellants for failing to lodge in the Turnover Action the identical fraud claims that they had previously asserted in both State and federal court, and that had already been dismissed by the bankruptcy court in the Discharge Action.

In this case, appellants suffered a judicial one-two punch: in federal court, they were told to litigate in State court; in State court, they were told that they should have litigated in federal court. *Res judicata* has no place here.

**ORDERS GRANTING SUMMARY JUDGMENT IN FAVOR OF FWB, BETZ, AND SLOAN REVERSED; ORDERS GRANTING MOTION TO DISMISS FILED BY APPELLEES SCHONHOLTZ, MANES, CUTLER, HOWLIN, AND COLLIATIE REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEES.**