731 A.2d 916

**FWB BANK et al.**

v.

**Ilene H. RICHMAN et vir.**

**No. 109, Sept. Term, 1998.**

Court of Appeals of Maryland.

June 15, 1999.

Thomas D. Murphy (James A. Mood, Jr., on brief), Rockville, for Petitioners.

Mark L. Shaffer (Baise, Miller & Freer, P.C., on brief), Washington, DC, for Respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, WILNER, CATHELL and THEODORE G. BLOOM (retired, specially assigned), JJ.

WILNER, Judge.

This dispute arises from a loan transaction. The parties have litigated in the Circuit Court for Montgomery County and in the United States Bankruptcy Court for the District of Maryland. The question is whether the borrowers—the Richmans—may pursue their remaining claims in the circuit court. The Court of Special Appeals held that they may, *Richman v. FWB*, 122 Md.App. 110, 712 A.2d 41 (1998), and we shall affirm that determination.

## BACKGROUND

### *Origin Of The Dispute*

On September 22, 1989, Edward and Ilene Richman, respondents here, borrowed $500,000 from petitioner, First

Women's Bank of Maryland (FWB), to finance the purchase and development of certain land in Haymarket, Virginia. The note required repayment within 18 months—by March 21, 1991—but it contained a provision allowing the maturity date to be extended until September 21, 1991, if the Richmans were not in default, requested the extension in writing, and paid a 1% extension fee. The original note was secured by a deed of trust on 9.2 acres of property and the assignment of certain partnership interests. It appears that $350,000 of the loan was used to pay for the purchase of the property and the balance of $150,000 to create an interest reserve fund, to carry the property for two years. The deed of trust created a first lien on 1.8 acres and a second lien on 7.4 acres.

In February, 1991, after the bank allegedly threatened not to grant even the extension to September, which the note called for, the parties commenced negotiations regarding an extension of the loan beyond September 21, 1991. Those negotiations produced a new arrangement that took effect in March, 1991, although there is some dispute over when the various documents evidencing the new arrangement were signed and a great deal of dispute over some of the circumstances leading to them. Under a Modification and Restatement of Deed of Trust Note, the maturity of $448,585 was extended until March 1, 1992, with the right of the Richmans to an additional six-month extension if they were not in default, requested the extension in writing, and paid an extension fee of 1.5%. The Modification agreement required the Richmans to make monthly principal payments of $2,000, commencing April 1, 1991, together with interest on the unpaid principal balance at the rate of 2% above prime. A condition of the new arrangement was that the Richmans deposit $50,000 with the bank, to secure the monthly payments of principal and interest. In an affidavit, Ms. Richman acknowledged the right of the bank to withdraw $5,500 per month from that reserve account.

Under the new arrangement, the bank released its second lien on the 7.4 acres in return for other security. One item of new security—the one that lies at the heart of this dispute—

was a hypothecation agreement signed on March 15, 1991, under which the Richmans pledged to the bank a securities account they had with Shearson Lehman Brothers, to the extent of $125,000.  That account was to serve as additional collateral for the loan.  In the hypothecation agreement, the Richmans warranted that they had the authority to execute the agreement and that they would cause the signatory authority on the account to be transferred to the bank upon the declaration of a default and a written request from the bank.  The dispute itself arose from the fact that Shearson Lehman had an internal policy of not permitting the hypothecation of accounts to a bank, and, in conformance with that policy, it refused to honor the hypothecation.  The hypothecation agreement contained an acknowledgment to be executed by Shearson Lehman, which, when the agreement was sent to it by FWB, the firm declined to sign.[1]  The bank later contended that the Richmans were aware, when they signed the hypothecation agreement, that Shearson Lehman would refuse to honor the hypothecation, that the bank was unaware of that policy, and that it was thereby defrauded by the Richmans into releasing its lien on the 7.4 acres.  The Richmans, on the other hand, contend that they were unaware of the Shearson Lehman policy but that the bank had discovered it prior to effecting the extension, and that the bank nonetheless insisted on the hypothecation in order to create a condition that could not be fulfilled and thus engineer a default.  The issue, in colloquial terms, was who knew what when?

### The Litigation:  Procedural History

On January 29, 1992, FWB filed suit in the Circuit Court for Montgomery County against the Richmans for breach of the modified deed of trust note, breach of the hypothecation agreement, and fraud.  It appears that the bank used the

---

1.  Although the basis for this policy is not directly set forth in the record, U.S. Bankruptcy Court Judge Duncan Keir, in one of his rulings, indicated that Shearson Lehman had made a margin loan and did not wish to give FWB (or any bank) a security interest that might take precedence over its interest in the collateral.

$50,000 reserve fund to pay the monthly installments until, in December, 1991, that fund was depleted. When the Richmans failed to make further payments and the bank was unable to obtain the assets in the Shearson Lehman account, it called a default and filed the suit. It sought a judgment of $420,617, representing an unpaid principal balance of $407,585 plus accrued interest and late charges.

With the complaint, FWB filed an application for writ of attachment of the Shearson Lehman account. In an accompanying memorandum, FWB alleged that Ms. Richman had substantially depleted the funds in the account, thereby depriving the bank of its security interest, and that, if the attachment were not allowed, the Richmans would further deplete the account. Notwithstanding the lack of a supporting affidavit, the court entered an immediate garnishment order and waived the requirement of a bond. Shearson Lehman answered the order and admitted the account, with a balance of $107,600—less than the $125,000 pledged to the bank. The Richmans moved to dissolve the garnishment, contending, among other things, that FWB had not made out a case of fraud and that it was improperly using a prejudgment attachment in place of an injunction designed to maintain the status quo. After a hearing, the court, on March 12, 1992, denied the motion to dissolve the attachment, for fear that if it released the account, the Richmans might, indeed, deplete it, but announced that it would treat the attachment as an *ex parte* injunction, which the Richmans could move to dissolve.

Rather than proceeding further in the circuit court at that point, the Richmans filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code. That filing, on May 29, 1992, immediately stayed all proceedings in the circuit court. On September 3, 1992, FWB filed a petition to discharge the loan debt from the Chapter 11 proceeding on the ground that the Richmans fraudulently induced the bank to release its lien on the 7.2 acres and modify the note. That petition is not in the record before us, but, from its description by bankruptcy court Judge Stephen Derby, we gather that it alleged that the bank was induced to alter its position by the

Richmans' agreement to hypothecate the Shearson Lehman account in the amount of $125,000 when the Richmans knew that Shearson Lehman would not agree to a hypothecation. The Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), provides, in relevant part, that a discharge under § 1141 does not discharge an individual debtor from any debt for money or an extension, renewal, or refinancing of credit to the extent obtained by false pretenses, a false representation, or actual fraud. We shall refer to the proceeding triggered by FWB's petition as the discharge action.

On December 22, 1992, Judge Derby entered an order lifting the automatic stay with respect to the circuit court case, in order to permit (1) the Richmans to file an answer and pursue a counterclaim and third party complaint, and (2) FWB "to pursue its claims as necessary to reduce them to a sum certain." A week later, pursuant to that authority, the Richmans filed an answer, counterclaim, and third party complaint in the circuit court action. With respect to the bank's action, the Richmans generally denied the accusatory allegations and asserted the affirmative defenses of unclean hands, fraud, misrepresentation, set off, and waiver.

In their counterclaim against the bank and a third party action against two officers of the bank, Leonard Sloan and Joseph Betz, the Richmans alleged that Betz had advised them in October, 1990, that the bank would not honor their right under the September, 1989, note to extend the loan, thereby effecting an anticipatory breach of the agreement, that he then relented and agreed to an extension if the Richmans made a substantial payment on the loan, pledged additional collateral, and created an interest reserve account, that Betz had investigated the assignability of the new collateral and had learned that the Shearson Lehman account could not be hypothecated in the manner demanded, that the Richmans had no knowledge of that condition and were not informed of it by Betz, that Sloan was aware of Betz's conduct, that through Betz and Sloan FWB knew that the Richmans would be in immediate default of the new agreement because of their inability to hypothecate the account, that the bank

never intended to abide by the extension agreement but intended instead to call an immediate default, and that the Richmans had been wrongfully induced into agreeing to the extension.

Upon those allegations, the Richmans sued for breach of contract—the failure by FWB to honor its obligation to extend the 1989 agreement in accordance with its terms, for concealing the material fact that the Shearson Lehman account could not be hypothecated, for making false, misleading, or deceptive statements in violation of Maryland Code, § 5–807(a)(1) and (4) of the Financial Institutions Article, and for intentional interference with the Richmans' future business and economic relations. As relief, the Richmans sought compensatory and punitive damages and an order enjoining FWB, Sloan, and Betz from interfering with the Richmans's business and their business relationships and transactions. Although in Count II they averred that the "Extension Note should be rescinded," they did not ask for that specific relief; nor did they ask that the hypothecation agreement be rescinded or declared void. They prayed a jury trial on all issues in the action.

At some point, the Richmans filed a similar counterclaim in the discharge action in the bankruptcy court, adding to it a claim under the Federal Equal Credit Opportunity Act. That counterclaim, which is a critical document in this appeal, is not in the record, nor are the motions for summary judgment apparently filed by the parties.[2]

On April 22, 1993, Judge Derby entered a number of rulings in the discharge action. He first granted the Richmans' motion for summary judgment with respect to FWB's claim, finding (1) insufficient evidence that the Richmans knew, when they signed the extension agreement, that the Shearson Lehman account could not be hypothecated, and thus insufficient

---

2. There are a number of relevant documents that are not in the record or the record extract. Other relevant documents are in the record but not the extract, or, conversely, are in the extract but not the record. We remind counsel of their obligations under Maryland Rules 8–413 and 8–501(c).

evidence of an intent by the Richmans to defraud the bank, and (2) the evidence showed a belief by the Richmans that FWB would investigate the additional collateral. With respect to the Richmans' counterclaim, Judge Derby dismissed on statute of limitations grounds the Equal Credit Opportunity Act claim. He then observed that the remaining four claims were based on State law, that the Richmans had filed the same claims in their counterclaim and third party complaint in the circuit court, and that he had lifted the stay with respect to that action. Because those remaining claims in the discharge action thus "can be fully litigated before the state court," he decided that the Bankruptcy Court "will abstain and not rule on those counts and will defer to the state court for resolution of those particular issues as well as any state law fraud issues." Based on the dismissal of the ECOA claim and the abstention with regard to the State claims, he dismissed the discharge action, "[t]hus concluding this case as far as the Bankruptcy Court is concerned." His order implementing that ruling was entered on April 25, 1993.

The next day, the Richmans filed in the Bankruptcy Court a complaint against FWB and Shearson Lehman for turnover of the Shearson Lehman account to the bankruptcy estate. We shall refer to that proceeding as the turnover action. The Richmans averred that the account was the property of the estate and necessary to a successful reorganization, that FWB had never perfected a security interest in the account, that because the circuit court had treated the attachment of the Shearson Lehman account as an injunction and, under injunction practice, the FWB lien could not relate back to service of the attachment, any rights that FWB may have in the account were avoidable by the Richmans, and that, based on Judge Derby's ruling the day before that there was no fraud on the part of the Richmans, there was no basis for an attachment on original process in any event.[3] Shearson Lehman paid the balance then in the account—$113,409—into the registry of

---

3. The theory of avoidability, as later described by Judge Derby when ruling on the complaint, was that any rights that FWB might have in the account based on the attachment could not have accrued until

the Bankruptcy Court and was dismissed. FWB and the Richmans each filed a motion for summary judgment in the turnover action. FWB claimed a security interest or lien on two grounds: the attachment/garnishment/injunction, and the various agreements comprising the extension, under which the account was pledged to the bank.

On February 23, 1994, Judge Derby denied the cross-motions for summary judgment. In an accompanying memorandum opinion, he recited the history of the litigation in both the circuit court and the bankruptcy court, noting that he had lifted the automatic stay so that the parties could proceed with their State law claims in the circuit court. He rejected the Richmans' contention that his earlier ruling in the discharge action constituted the law of the case with regard to any fraud claim by FWB, again pointing out that that was a State law matter and that he had elected to abstain in favor of the pending circuit court case. The circuit court's action regarding the motion to dissolve the garnishment was "only preliminary to protect the res," and Judge Derby declined to interpret the significance of the order treating the garnishment as an injunction, which also was a State law matter. He deferred as well with respect to the effect of the hypothecation agreement, preferring to let the State court rule first. Judge Derby concluded his opinion with the statement that, "[w]hen the State court has made its rulings on the claims of the parties against each other under State law, the bankruptcy court will then apply those rulings to complete the administration of this estate under bankruptcy law." That determination was reflected as well in the court's order, in which the court "abstains from hearing this matter until after the litigation between the parties now pending in the Circuit Court for Montgomery County, Maryland is concluded." [4]

---

March 12, 1992, when the circuit court decided to treat the attachment as an *ex parte* injunction, and that, as the petition in bankruptcy was filed within 90 days thereafter, any lien right acquired by FWB would be an avoidable preference.

4. The heart of the problem leading to these parallel proceedings was identified by Judge Derby in his memorandum opinion: "The dispute is

The matter then returned to the circuit court where, on August 2, 1994, the court, through Judge Durke Thompson, (1) granted the Richmans' motion for summary judgment as to Count III of FWB's complaint—the count alleging that the bank was fraudulently deceived by the Richmans into believing that the Shearson Lehman account could be hypothecated, and (2) dissolved the attachment/garnishment/injunction relating to that account. The summary judgment was based on Judge Derby's conclusion in the discharge action that FWB had not presented sufficient evidence of an intent to defraud, a determination that the court found collaterally estopped the bank from proceeding further with what the court regarded as the same claim. The attachment/injunction/garnishment relating to the account itself was dissolved on a number of grounds. To the extent that the order constituted an attachment, the court noted that FWB had filed neither a supporting affidavit nor a bond, both of which were required. It pointed out that the funds were then in the registry of the bankruptcy court in any event and were in no danger of dissipation. To the extent that the order was treated as an *ex parte* injunction, under the rules relating to such injunctions, it expired after 10 days and was never renewed.

The game of Federal/State ping pong continued next in the bankruptcy court. On August 15, 1994, Bankruptcy Judge Duncan Keir, who had assumed responsibility over the case from Judge Derby, held a hearing on a number of matters, including the Richmans' continuing effort to have the funds formerly in the Shearson Lehman account turned over to the estate. The circuit court's dissolution of the attachment/garnishment/injunction, they argued, established that FWB had no interest in the account and collaterally estopped the bank from contending otherwise in the bankruptcy action. Judge Keir found to the contrary, at least in part. He agreed that the circuit court's latest ruling resolved the issue of whether

---

being pressed simultaneously in the State courts and in the Bankruptcy Court, depending on which forum a party perceives to be more sympathetic on a particular issue." That kind of forum shopping, unfortunately, did not abate.

FWB had any lien on the account by virtue of the attachment/garnishment/injunction, but he found that the State court had not determined, and perhaps had no jurisdiction to determine, whether FWB had a perfected security interest by virtue of the various agreements between the parties. In that regard, he stated:

"The other ruling which could bear on this issue would be the ruling on the actual liability of the debtor to the lender. Obviously if the debtor doesn't owe the lender any money, then the lender doesn't have a security interest because there is nothing to secure. But I do not read Judge Derby's order as referring to the state court the issue concerning the consensual lien rights of the parties, i.e., their, in effect, ownership rights to this fund. That has not been ruled on. There is no disposition of this issue. Accordingly, the fund remains subject to the claims of [FWB] whether they are with or without merit."

Whether or not as a result of that ruling, the plan of reorganization was not approved, and the bankruptcy was converted to a Chapter 7 proceeding. Michael Wolff was appointed as trustee and thus succeeded the Richmans as the plaintiff in the turnover action. At some point thereafter, both the Richmans and FWB entered into negotiations with the trustee for the sale of the Richmans' State court claims against FWB. At first, a tentative agreement was reached with FWB, but it was opposed by the Richmans and was rejected by Judge Keir. We are informed that the Richmans succeeded in reaching an agreement with the trustee and that, on October 27, 1995, the Richmans purchased their claim from the trustee for $125,000. The sale, the Richmans tell us in their brief, was completed on November 2, 1995. Although there is no clear evidence in the record confirming the sale and its approval by Judge Keir, other than a brief mention of it by FWB's counsel in a proceeding before Judge Thompson, the assertion of it contained in the Richmans' brief is not disputed, so we shall assume that it is accurate.

In January, 1995, the Richmans filed a new action in the circuit court, naming as defendants five officers or directors of

FWB. The allegations made against those defendants were essentially the same as made against Messrs. Sloan and Betz in the third party action filed by the Richmans in December, 1992, and they asked for the same relief. The two actions were immediately consolidated. On March 7, 1995, Judge Keir held a hearing in the turnover action on the remaining issue regarding the Shearson Lehman account, as presented in the cross-motions for summary judgment—whether, as a result of the various agreements, particularly the hypothecation agreement, FWB had a perfected security interest in the securities when the bankruptcy petition was filed. During that hearing, former counsel for the Richmans, who no longer were parties to the action but were permitted to participate in the hearing, noted that, for purposes of that proceeding, the Richmans were conceding that the hypothecation agreement had been signed by them and delivered to FWB, but that they were reserving their right to argue in State court that fraud existed in the obtention by FWB of that agreement and that the agreement may not be enforceable for that reason.[5] Judge Keir responded that the issue of fraud had not been raised in the turnover action. He stated that the issue was whether FWB had a perfected security interest by virtue of the agreements and:

"I don't believe that a ruling by this Court on that is (a) precluded by any further assertions of fraud which the parties may have in some state court proceeding because it has not been raised in this adversary; and secondly, I make no rulings as to what effect any ruling of this Court would have on the state court action as that would be determined by the court in the action in which preclusion would be asserted by some party, not the court whose action might be alleged to be the basis for such assertion."

5. When the bankruptcy proceeding was converted from Chapter 11 to Chapter 7, counsel for the Richmans were allowed to continue as special counsel to the trustee. The relationship between the attorneys and the trustee was not a harmonious one, as noted by the Court of Special Appeals. *See Richman v. FWB, supra,* 122 Md.App. at 128–30, 712 A.2d at 49–50.

On April 25, 1995, Judge Keir filed a memorandum opinion in which he rejected each of the arguments made by the Richmans and granted FWB's motion for summary judgment. Judge Keir concluded that, by virtue of the hypothecation agreement, FWB had perfected a security interest in the Shearson Lehman account in accordance with the Maryland Uniform Commercial Code. He did not purport to rule upon any of the fraud claims made by the Richmans. His analysis and determination were solely on the basis of the relevant provisions of the commercial code.

The Richmans and their former counsel filed a motion for reconsideration, which is not in the record extract, but in which they apparently complained that Judge Keir had ruled upon an issue that Judge Derby had expressly reserved for determination by the State court. In a memorandum opinion filed July 21, 1995, Judge Keir denied the motion. He concluded that neither the Richmans nor their former attorneys had standing to file the motion. As to the Richmans, Judge Keir held:

> "The debtors are not parties of record despite their interest in the outcome. Such interest alone is insufficient. Apparently, the debtors chose not to seek the status of parties in the action, having failed to file any motion for joinder or intervention. Their belated attempt to take part in or control of the proceeding must fail."

The court's ruling on standing effectively disposed of the motions. Nonetheless, Judge Keir addressed the substance of the motion, which he characterized as an argument that he had erred in granting FWB's motion for summary judgment because, as a result of Judge Derby's February 23, 1994 order, the enforceability of the hypothecation agreement remained at issue in the circuit court litigation and that Judge Keir's ruling was therefore "premature." Judge Keir disagreed. He noted that, although a fraudulent inducement claim had been made in the State court case, the debtors had never made that claim in the bankruptcy court as a defense to the hypothecation agreement, and thus to FWB's assertion of a security interest in the Shearson Lehman account. In that regard, he observed

that, to the extent that Judge Derby's February, 1994 order contemplated a further determination by the State court before further proceedings in the bankruptcy court, in August and November, 1994, the Richmans and the trustee represented to the court that the stay/abstention decided upon by Judge Derby should be lifted:

> "Thereafter, in the prosecution of the issue of whether or not FWB held a perfected security interest in the Shearson Account proceeds, the estate could have asserted any defense to the alleged perfected security interest. The estate raised, briefed and argued only the defense of failure to obtain and perfect a security interest under the Uniform Commercial Code but did not assert any defense that the contract was obtained by fraud. *The fact that such allegations may have existed in separate state court suits pending at the same time, did not present that issue before this court, nor was that issue brought before this court by Judge Derby's February 23, 1994 Order, or precluded from being so brought as discussed above.*"

(Emphasis added.)

Judge Keir regarded the debtors as belatedly raising a new defense to the validity and enforceability of the hypothecation agreement and, on the basis of that defense, asking the court to send the matter back to the circuit court. Failure to raise the defense earlier did not, he concluded, constitute a ground for post-judgment relief under F.R.B.P. 9024(b).

Aggrieved, the Richmans appealed the denial of their motion for reconsideration to the U.S. District Court. Apparently recognizing the standing problem, they moved to intervene in the turnover action as of right for purposes of appealing Judge Keir's decision. The court denied that motion in October, 1995,[6] and in a Memorandum Opinion and Order filed November 30, 1995, the district court affirmed Judge Keir's ruling. Judge Williams agreed with Judge Keir that, once the

---

**6.** As with so many other relevant documents in this case, neither the motion to intervene nor Judge Williams's October memorandum opinion are to be found in the record before us.

proceeding was converted to a Chapter 7 proceeding, the Richmans were no longer parties to the turnover action and had.no standing in it. Judge Williams further agreed that, as the estate had not raised the issue of fraudulent inducement in the turnover action, there was no error in the bankruptcy court's declining to consider it in a post-judgment action. The Richmans then sought review in the U.S. Court of Appeals for the Fourth Circuit, which affirmed the district court. *Matter of Richman*, 104 F.3d 654 (4th Cir.1997). The appellate court dealt only with the standing issue and made, essentially, two holdings. First, the court concluded that the Richmans were not parties to the turnover action, following conversion to Chapter 7, because they failed to intervene timely in that action while it remained in the bankruptcy court. Second, it held that Judge Williams did not err in denying their motion to intervene as of right at the district court level. They had no *right* of intervention because (1) of their failure to intervene in the bankruptcy court, and (2) their interest in the account was adequately represented by the trustee. The appellate court did not address the merits of Judge Keir's ruling on FWB's claim or on his determination that the issue of fraudulent inducement had not been raised in the bankruptcy court.

In December, 1995, following Judge Williams's affirmance of Judge Keir's decision, FWB, Sloan, and Betz moved for summary judgment in the circuit court action and the defendants in the second, consolidated, action moved to dismiss the complaint against them. The basis of the motion for summary judgment was that three of the four counts in the Richmans' counterclaim and third party action were premised on alleged fraud in obtaining the hypothecation of the Shearson Lehman account and that, because that issue had been conclusively determined by the bankruptcy court, the Richmans were precluded by both *res judicata* and collateral estoppel from relitigating the question of fraud. In the bank's view, implicit in Judge Keir's conclusion that FWB properly obtained a security interest in the account was a finding that no fraud was committed in the obtention of that interest, for the

existence of fraud would have vitiated the instrument creating the security interest. Although the bank acknowledged that, once the bankruptcy was converted to Chapter 7, the Richmans were not technically parties in the turnover proceeding, it maintained that they had had their "day in court."

The Richmans threw up a barrage of arguments against the application of *res judicata.* First, they asserted that the doctrine was not applicable because (1) a fraud claim would have been in the nature of a counterclaim to FWB's assertion that it had a perfected security interest in the account and, under both Federal and State procedure, the filing of a counterclaim was permissive, rather than mandatory, and (2) application of *res judicata* in this situation would intrude upon the liberal joinder rules under both Federal and State law. The court rejected those arguments. It concluded that a fraud claim would not have been in the nature of a counterclaim—that the turnover action was instituted by the Richmans and it was incumbent upon them to advance any theory they had to warrant the relief they sought and defeat FWB's claim of a security interest. Relying principally on *Kent County Bd. of Educ. v. Bilbrough,* 309 Md. 487, 525 A.2d 232 (1987), the court found no merit in the joinder argument. Applying the "transactional" test, the court concluded that a plaintiff must assert all claims arising out of a particular transaction against a particular defendant or be barred from asserting them later.

Next, the Richmans contended that there was no identity of parties or identity of issues. As to the former, they noted that Sloan and Betz were not parties to the bankruptcy action and that, once the proceeding was converted to Chapter 7, neither were they. The court concluded, however, that Sloan and Betz were sufficiently in privity with FWB and that the Richmans were sufficiently in privity with the trustee. The conversion to Chapter 7, the court held, did not change the nature of the proceeding in any fundamental way: the goal of recovering the Shearson Lehman account for the bankruptcy estate remained the same. In that regard, the court determined that the Richmans did not seek the asset for their

personal use but only to pay off creditors, which was also the trustee's interest. The identity of issues argument was based on the assertion that the fraud claim was not raised in the bankruptcy proceeding because of Judge Derby's abstention on that claim—his determination that it proceed in the State court. The circuit court concluded, however, that Judge Derby's April, 1993 order was entered in the discharge action, not the turnover action, and that his subsequent order of February, 1994, which *was* entered in the turnover action, was not entered until a year after the turnover action was filed, and it therefore could not have precluded the Richmans from raising the fraud issue in that action. Moreover, the court noted that Judge Derby's order merely abstained from hearing a fraud claim until after resolution of the pending State court action; it did not preclude the Richmans from raising that issue in the bankruptcy proceeding. The court acknowledged that the fraud claim was never actually litigated in the bankruptcy court but held that *res judicata* was applicable because that claim *could* have been raised and determined in that court. Accordingly, the court granted the motions by FWB and the individual defendants for summary judgment and to dismiss and entered judgments in their favor.

As we have indicated, the Court of Special Appeals had a different view and reversed. That court determined that the Richmans' fraud claims "were never litigated in the prior bankruptcy action, nor, with propriety, could they have been." *Richman v. FWB, supra*, 122 Md.App. at 147, 712 A.2d at 59. The discharge and turnover actions, it held, were not separate actions but were both part of the same bankruptcy case, and thus Judge Derby's abstention orders were relevant in the turnover action. The heart of the appellate ruling was its determination that:

> "Judge Derby's orders of April 1993 indisputably fostered [the Richmans'] belief that the bankruptcy court would not entertain [their] State fraud counts, whether in the Discharge Action or the Turnover Action. At the very least, in considering whether, 'with propriety,' [the Richmans] were able to litigate their State claims in federal court, it was

certainly reasonable for [them] to believe that they were required by Judge Derby to pursue their fraud claims in State court."

*Id.* at 156, 712 A.2d at 63. Although agreeing with FWB and the other defendants that Judge Derby's orders did not actually forbid the Richmans from raising a fraud claim in the bankruptcy court, the Court of Special Appeals noted that Judge Derby "could not have been clearer in articulating that the bankruptcy court would not consider [the Richmans'] fraud claims" and in directing them "to pursue their State claims in the circuit court." *Id.* at 160, 712 A.2d at 65. It concluded that the Richmans "suffered a judicial one-two punch: in federal court, they were told to litigate in State court; in State court, they were told that they should have litigated in federal court. *Res judicata* has no place here." *Id.* at 167, 712 A.2d at 69.

## DISCUSSION

The petition for *certiorari* filed by FWB and the individual defendants raised three questions, two of which were premised on the assertion that the Court of Special Appeals improperly rejected "specific factual findings" of the Bankruptcy Court and the U.S. District Court. The "findings" referred to consisted of Judge Keir's pronouncement in ruling on the Richmans' motion for reconsideration that the issue of fraud had not been raised in the turnover action and would therefore not be addressed by him. The third question attacks the intermediate appellate court's holding that the discharge and turnover actions were not independent actions. Those issues are recast somewhat in petitioner's brief.

Although at various times during the course of this dual-track litigation, issues of *res judicata*, collateral estoppel, and collateral attack have been raised, the issues framed by petitioners in this appeal really involve only the doctrine of *res judicata*, or claim preclusion. It is clear, and not disputed, that the fraud claim that the Richmans seek to litigate now in the circuit court was never addressed or resolved on its merits by the bankruptcy court; nor did that court ever directly

resolve any factual dispute that would be dispositive on the merits of that claim. The preclusion defense stems entirely from the assertion that the fraud claim was not properly presented by the Richmans in the bankruptcy court when it could and should have been so presented. Like the Court of Special Appeals, we find no merit in that assertion; it ignores what, in fact, was before the bankruptcy court during the several stages of the litigation.

Preliminarily, we reject FWB's efforts to ground a *res judicata* claim in Judge Keir's denial of the Richmans' motion for reconsideration and the affirmance of that denial in the U.S. District Court and the U.S. Court of Appeals for the Fourth Circuit. The record shows that Judge Keir denied the motion on the ground that the Richmans did not have standing *at the time they filed the motion for reconsideration* to raise the issue of whether FWB fraudulently induced the formation of the hypothecation agreement. Although Judge Keir noted that the Richmans might have raised fraud earlier in the turnover action, he made no ruling as to when they could have raised that issue, only that they could not raise it for the first time in support of a motion for reconsideration. It was that ruling that was affirmed on appeal.

The basic rule of claim preclusion in this context is not difficult: "A valid and final personal judgment rendered in favor of the defendant bars another action by the plaintiff on the same claim." RESTATEMENT (SECOND) OF JUDGMENTS § 19 (1982). As we pointed out in *deLeon v. Slear*, 328 Md. 569, 580, 616 A.2d 380, 385 (1992), the traditional principle of *res judicata* has three elements: "(1) the parties in the present litigation should be the same or in privity with the parties to the earlier case; (2) the second suit must present the same cause of action or claim as the first; and (3) in the first suit, there must have been a valid final judgment on the merits by a court of competent jurisdiction." Although all three elements were in dispute at various points in the litigation, the second element is the one principally before us—whether the

fraud claim sought to be litigated in the circuit court is the same as the claim presented in the bankruptcy action.

When an earlier court has actually ruled on the matter sought to be litigated in a second court, the "same claim" analysis is usually straightforward. It is when, as here, the earlier court has *not* directly ruled upon the matter that the analysis becomes more complex, for then the second court must determine whether the matter currently before it was fairly included within the claim or action that was before the earlier court and *could* have been resolved in that court. It has long been established that a judgment between the same parties or their privies upon the same cause of action is conclusive "not only as to all matters that have been decided in the original suit, but as to all matters which with propriety could have been litigated in the first suit." *Alvey v. Alvey*, 225 Md. 386, 390, 171 A.2d 92, 94 (1961); *MPC, Inc. v. Kenny*, 279 Md. 29, 32, 367 A.2d 486, 488–89 (1977). In dealing with that issue, we have adopted the "transactional" approach set forth in § 24 of the RESTATEMENT (SECOND) OF JUDGMENTS: "When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar . . . the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *deLeon v. Slear, supra,* 328 Md. 569, 590, 616 A.2d 380, 390; *Kent County Bd. of Educ. v. Bilbrough, supra,* 309 Md. 487, 498, 525 A.2d 232, 237–38. In deciding whether a factual grouping constitutes a "transaction," the RESTATEMENT directs a pragmatic approach, "giving weight to such considerations as whether the facts are related in time, space, origin or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." RESTATEMENT, *supra,* § 24(2).

Under this analysis, it is clear that the issue of whether FWB fraudulently induced the Richmans into entering into the hypothecation agreement, which underlies three of

the four counts in their circuit court actions, was, at one point, most definitely part of the claim made in the bankruptcy court. As we indicated, some time prior to April, 1993, the Richmans filed precisely the same claims in the bankruptcy case as they filed in the circuit court, as a counterclaim in the discharge action. Those claims were never abandoned by the Richmans. Judge Derby simply, and quite properly, decided that, since they were entirely State law claims, they should be resolved by the State courts. Judge Derby could not have been more explicit in that regard: the court, he said, "will abstain and not rule on those counts and will defer to the state court for resolution of those particular issues as well as any state law fraud issues." With that determination, he regarded the discharge action as concluded. Certainly, at that point, no claim of *res judicata* could properly be made. The situation fell squarely within the principle set forth in § 20(1)(b) of the RESTATEMENT, that a personal judgment for the defendant, although valid and final, does not bar another action by the plaintiff on the same claim when "the court directs that the plaintiff be nonsuited (or that the action be otherwise dismissed) without prejudice." *See Lone v. Montgomery County,* 85 Md.App. 477, 584 A.2d 142 (1991).

Directly on the heels of Judge Derby's ruling that there was insufficient evidence of fraud on the part of the Richmans, and his consequent granting of their motion for summary judgment in the discharge action, the Richmans filed the turnover action. That action was based on the assertion that the only lien that FWB could have obtained came from the "injunction" constructively issued in March, 1992, and that, as the bankruptcy petition was filed within 90 days thereafter, any such lien was voidable as a preference. Although the Complaint for Turnover alleged generally that "FWB never had a perfected security interest in the Shearson Lehman account" and that the account was "not FWB collateral," the complaint itself did not focus on any rights FWB may have obtained by virtue of the hypothecation agreement.

Because we are not privy to whatever answer FWB may have filed to the complaint, as it is not in the record, it would

appear, from the record we have, that fraud first became a potential issue in July, 1993, when FWB filed its motion for summary judgment, claiming a security interest not only by virtue of the attachment/garnishment/injunction, but also under the hypothecation agreement. One way to defeat that alleged interest would be to show that the agreement had been procured by fraud. The fraud issue, of course, was then pending in the circuit court and could as easily have been litigated there. For a year, however, the matter was not pursued in either court.

The next significant event was Judge Thompson's August, 1994 ruling that FWB acquired no lien on the Shearson Lehman account by virtue of the attachment/garnishment/injunction. That apparently prompted Judge Keir to reactivate the turnover action. His ruling, on August 15, 1994, that, while Judge Thompson's determination effectively resolved the issue of whether FWB had any security interest by virtue of the attachment/garnishment/injunction, the question of whether FWB acquired a security interest under the hypothecation agreement remained open, placed the validity of that agreement squarely into contention. Certainly at that point, if not earlier, the Richmans must have known that, if they intended to defeat the hypothecation agreement on the ground that it was fraudulently induced, they would either have to raise that defense in the bankruptcy action or have the issue of fraud resolved in the State court and hope that the bankruptcy court would accept the State court finding in determining the lien issue.

■ Unfortunately for the Richmans, it was at that point that the bankruptcy was converted to a Chapter 7 case and they ceased to be parties to the turnover action. Absent permissive intervention, which they never sought, they no longer had the right to interpose the fraud defense. 11 U.S.C. § 323(a); *In re Richman,* 104 F.3d 654, 657 (4th Cir.1997) ("As a general matter, in a Chapter 7 proceeding, the trustee alone has standing to raise issues before the bankruptcy court and to prosecute appeals."); *Detrick v. Panalpina, Inc.,* 108

F.3d 529, 535 (4th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 52, 139 L.Ed.2d 17 (1997); *In re Eisen,* 31 F.3d 1447, 1451 n. 2 (9th Cir.1994), *see also Adams v. Manown,* 328 Md. 463, 615 A.2d 611 (1992). The trustee was in command of the litigation, and, as noted by the Court of Special Appeals, the relationship between the Richmans (and their former counsel) and the trustee was not always a harmonious one. Indeed, during the period that FWB and the Richmans were each negotiating with the trustee for the sale of the claim against FWB, the Richmans and the trustee were close to being, and may have been, in a conflict situation.

As we have indicated, in the fall of 1995, the Richmans purchased from the trustee their personal claim for money damages against FWB and the other defendants. That sale and its approval by the bankruptcy court is significant, for it effectively split the fraud issue, with the bankruptcy court's blessing. The trustee, who retained full control to raise the issue in defense of FWB's claim that it had a security interest in the Shearson Lehman account proceeds, had a lesser incentive to do so. He had received from the Richmans the full $125,000 covered by the hypothecation agreement, so, while the estate would not gain anything more if FWB was successful in preserving its lien, neither would it suffer any loss. As non-parties, the Richmans had no standing to raise the fraud issue for the purpose of defeating FWB's lien claim. Having purchased their personal claim, however, they, and they alone, had standing to pursue it. Judge Derby had already ruled that that very claim must be litigated in the State court, and Judge Keir never overruled that determination or acted inconsistently with it. Indeed, the splitting of the fraud issue between the trustee and the Richmans and the relegation of the Richmans' claim for consequential money damages to the State court fully explains Judge Keir's decision and pronouncements in dealing with the Richmans' motion for reconsideration. He would not allow the Richmans, who were not then parties to the turnover action, to raise the issue of fraud in that proceeding.

When the matter is analyzed in this chronological fashion, it becomes evident that the only possible basis for a *res judicata* claim arises either from the 16–month period between the filing of the turnover action by the Richmans in April, 1993, and the conversion of the bankruptcy case to a Chapter 7 proceeding in August, 1994, or from a conclusion that the Richmans were in privity with the trustee thereafter.

■ The general rule, as noted in the RESTATEMENT (SECOND) OF JUDGMENTS § 34 comment b, is that "a party is bound by the determination of an issue only if he actually participates in its adjudication. Accordingly, issues determined before he became a party *or after he ceased to be a party* are not conclusive upon him." (Emphasis added.) *See also, Mid–Continent Cas. Co. v. Everett,* 340 F.2d 65, 69–70 (10th Cir. 1965); *Flanzbaum v. M & M Transp. Co.,* 286 F.2d 500, 503 (2d Cir.1961); *Urban v. King,* 995 F.Supp. 1251, 1256 (D.Kan. 1998); 18 Wright, Miller & Cooper, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 4449 (1981). Subject to the issue of privity, strict application of this principle would preclude application of *res judicata* against the Richmans, for they had ceased to be parties to the turnover action when the ultimate issues in that action were adjudicated. Even if we do not apply that principle strictly and look more closely at the 16–month period when the Richmans *were* in control of the litigation, we need to take into account (1) the fact that the Richmans sought to litigate their claim for consequential damages based on FWB's alleged fraud in the discharge action and were told three times by Judge Derby that that claim would have to be litigated in the State court, (2) the marginal relevance of fraud as a defense to the hypothecation agreement in the turnover action until FWB responded to the turnover complaint and clearly asserted a contract lien and Judge Keir, in August, 1994, focused attention on that claim, and (3) the fact that the Richmans lost control of the litigation at that point. Under these circumstances, we do not believe that claim preclusion may properly be based on their own failure to pursue a fraud claim in the turnover action.

Nor do we believe that *res judicata* can appropriately be based on the posited privity between the Richmans and the trustee. The U.S. Court of Appeals for the Fourth Circuit, in ruling that the Richmans were not entitled to intervene in the turnover action as of right, concluded that they failed "to establish that whatever interest they may have possessed in the Shearson Account was inadequately represented by the bankruptcy trustee," which was a precondition to intervention as of right. *Matter of Richman, supra,* 104 F.3d at 660. The Federal Court was looking at the representation issue solely in the context of a defense to enforcement of the hypothecation agreement, however. The matter before us is quite different. By the time Judge Keir decided the enforceability issue, the trustee had split the fraud claim and sold the claim for consequential damages to the Richmans. That issue was not before Judge Keir, and, by virtue of its sale, the trustee no longer had any standing to pursue it in the bankruptcy action. As to that claim, therefore, there could be no privity. "Privity in the res judicata sense generally involves a person so identified in interest with another that he represents the same legal right." *Williams v. Stefan,* 133 B.R. 119, 121 (N.D.Ill.1991) (quoting *In re Matter of Wilcher,* 56 B.R. 428, 438 (Bkrtcy.N.D.Ill.1985)). Once the claim for consequential damages was sold, no identity of interest existed with respect to it.

In adopting the transactional test in *Kent County Bd. of Educ. v. Bilbrough, supra,* 309 Md. 487, 525 A.2d 232, we noted the principle enunciated in Comment a to § 24 of the RESTATEMENT that equating claim with transaction "is justified only when the parties have ample procedural means for fully developing the entire transaction in the one action going to the merits to which the plaintiff is ordinarily confined." *Id.* at 499, 525 A.2d at 238. Under the circumstances noted, we agree with the Court of Special Appeals that the Richmans did not have ample procedural means for fully developing their fraud claim in the bankruptcy case.

For these reasons, we hold that the Richmans are not barred by *res judicata* from litigating their claims against FWB and the individual defendants in the circuit court.

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.